1
2
3
4
5                    IN THE UNITED STATES DISTRICT COURT
6                  FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8   EDWARD ALVARADO, *et al.*,                No. C 04-0098 SI; No. C 04-0099 SI
9              Plaintiffs,                    **ORDER RE: DISBURSEMENT OF**
                                             **INTERPLED FUNDS**
10    v.
11  FEDEX CORPORATION, dba FEDEX
    EXPRESS,
12
              Defendant.
13  _____/
14
15                          **INTRODUCTION**
16          This order is prompted by a long and acrimonious battle between former co-counsel over

17  attorneys' fees.  Unfortunately, as is often the case when attorneys fight over fees, the clients have been

18  caught in the crossfire.  The Court regrets that the interpleader process has been so lengthy, and the

19  Court recognizes that the settlement plaintiffs and FedEx have been unable to enjoy the peace for which

20  they bargained when they  settled these cases in November 2007.  Unfortunately, this fee dispute has

21  not only turned into a second major litigation that in many senses dwarfs the very extensive litigation

22  on the merits, but it also raised a number of complicated and unusual factual and legal questions about

23  the relationships between counsel and the plaintiffs, and about whether misrepresentations were made

24  to this Court.

25          The Court has carefully considered the voluminous record on the fee fight, and makes the factual

26  findings and legal conclusions herein.  As set forth below, the Court concludes that Ms. Parker may

27  recover fees under *quantum meruit*.  The Court finds that Ms. Parker had contingency fee agreements

28  with the settlement plaintiffs, and that when plaintiffs fired her in March 2006, the contingency had not

**United States District Court**
For the Northern District of California

yet occurred; thus Ms. Parker's recovery is limited under *quantum meruit* to the reasonable value of her services rendered up to the time of discharge.  The Court further finds that Mr. McCoy and Ms. Parker did not have a fee-sharing agreement, and that they did not comply with California Rule of Professional Conduct 2-200; however, because Ms. Parker had contracts with the settlement plaintiffs, the failure to comply with Rule 2-200 does not affect Ms. Parker's ability to recover in *quantum meruit*.

Fifty percent of the settlement funding ($749,500) has already been disbursed to the seven settlement plaintiffs.  The other half ($749,500 plus interest) was interpled with the Court, to cover any contingent attorneys' fees payable to Mr. McCoy and/or Ms. Parker, and to cover any other necessary payments.  This order will govern how the funds in the interpleader account will be disbursed.

The Court finds that Mr. McCoy and Ms. Parker are entitled to share in the portion of the interpled funds originally set aside for contingent fees – 40% of the settlement monies –  and no more.  Thus, the remaining interpled funds (10% of the settlement funds, plus accrued interest) will be disbursed to the settlement plaintiffs according to their pro rata settlement amounts.

The balance of the money interpled for attorneys' fees and costs (40% of the settlement funds, less payments already made to attorney Michael Davis, plus accrued interest) will be disbursed to Mr. McCoy and Ms. Parker under a 75% to 25% ratio based on the Court's assessment of the value of Mr. McCoy's work for plaintiffs in achieving the ultimate settlements in these cases, and the value of Ms. Parker's work performed for plaintiffs prior to her discharge.  Mr. McCoy's gross allocation will total $413,700 and Ms. Parker's gross allocation will total $137,900.  As set forth in this order, deductions will be made to Mr. McCoy's allocation to repay the three plaintiffs from whom he demanded payments out of their settlement proceeds in contravention of his representations to this Court that he would not be receiving any money from the plaintiffs from the settlements.  Deductions will also be made from Mr. McCoy's portion to pay his judgment creditor, Angela Alioto; to pay the $25,000 sanctions imposed by this Court's March 19, 2009 Order, should it be affirmed on appeal; and to reserve funds pending an accounting of unpaid bills from the Special Master.  Deductions will be made from both Mr. McCoy's and Ms. Parker's awards to pay the fees of Dr. Carlene Young, one of the plaintiffs' experts.

The Court emphasizes to the settlement plaintiffs that, with the disbursements provided in this order, they are receiving the full 60% of their settlement amounts.

**All plaintiffs and claimants shall inform the Court by 5:00 pm on Monday December 28, 2009 if they wish to pick their checks up from the Court or if they wish to have the checks mailed directly to them. Counsel and lienholders shall file a statement of their wishes, and the plaintiffs may fax the Court's Clerk, Tracy Forakis, at 415.522.2184. Upon the filing of this order, the Court's financial department will begin the process of preparing checks, and Court will inform the parties and claimants when the checks are available.**

As a final introductory matter, the Court must address the question of filing this order under seal. Mr. McCoy, on behalf of the settlement plaintiffs, has requested that the entire order be filed under seal. Mr. McCoy asserts that sealing is necessary because the plaintiffs' settlement agreements contain confidentiality provisions, and also to ensure consistency between this case and the related class action *Satchell v. FedEx*, C 03-2659 SI, in which an order regarding an attorneys' fees dispute between Mr. McCoy and his co-counsel was filed under seal.

The Court finds it inappropriate to file the entire order under seal. With the exception of the settlement amounts for each of the plaintiffs, all of the matters addressed in this order have been a matter of public record: Mr. McCoy and Ms. Parker have publicly filed copies of the client retainer agreements, communications between themselves and the clients, and so forth. In contrast, in the fee dispute in *Satchell*, counsel (aside from Mr. McCoy) sought to preserve the attorney client and attorney work product privilege, and thus sought to file all protected papers under seal. More importantly, the instant dispute presents issues with far-reaching implications, and for that reason, sealing the entire order is inappropriate. The Court agrees that the amounts of the disbursements to the plaintiffs should be sealed because the specific settlement amounts are confidential and have largely remained so during the litigation of these matters. Accordingly, the Court will draft and file under seal a separate order specifying the amounts to be disbursed to the plaintiffs. The balance of this Order will be filed in the public record.

**BACKGROUND**

These cases were filed in 2004 on behalf of sixteen plaintiffs who alleged various claims of employment discrimination against FedEx. The caption on the complaints listed plaintiffs' attorneys

as Waukeen McCoy of the Law Office of Waukeen McCoy, and Kay McKenzie Parker of the Law Office of Kay McKenzie Parker. Docket No. 1.[1] Mr. McCoy and Ms. Parker were involved in various aspects of pretrial litigation, and often communicated to the Court and opposing counsel on joint letterhead. *See, e.g.,* Docket No. 27 (letter on joint letterhead from Mr. McCoy to the Court and opposing counsel). On June 29, 2004, attorney John Burris filed a notice of appearance on behalf of plaintiffs. From that date until Mr. Burris' withdrawal in October 2005, all three counsel (McCoy, Parker and Burris) were listed on the pleadings. *See, e.g.*, Docket No. 35 (joint case management conference statement); Docket No. 49 (plaintiffs' motion to compel).

In August 2005 and March 2006, the Court granted summary judgment in favor of FedEx on all claims alleged by plaintiffs John Azzam, Lore Paogofie, Christopher Wilkerson, Charles Gibbs, Maria Munoz, and Gary White. Docket Nos. 198, 366, 368 in 04-0098 and Docket No. 227 in 04-0099. The Court granted in part and denied in part defendant's motions for summary judgment as to the other ten plaintiffs. *Id*. & Docket No. 367 in 04-0098.

## I.    Plaintiffs terminate Ms. Parker as counsel

The first sign of the present problems surfaced on March 31, 2006. On that date, Ms. Parker filed a Notice of Attorney Lien for Fees and Costs. Docket No. 375. That document states, *inter alia*, that "by virtue of a written fee agreement between said plaintiffs and the undersigned attorney, she has a lien ahead of all others on plaintiffs' claims and causes of action, and on any settlement or judgment in favor of any plaintiff in this action, to secure payment for legal services rendered in an amount equal to forty percent (40%) of any recovery by plaintiff(s)." *Id*. On April 12, 2006, plaintiffs' former attorney Michael Davis filed a Notice of Attorneys' Fee Lien. Docket No. 377. On April 20, 2006, plaintiff Edward Alvarado filed a Notice of Substitution of Counsel for Plaintiff Edward Alvarado, stating that he wished to dismiss Mr. McCoy as his attorney and wanted to be represented solely by Ms. Parker. Docket No. 380.

In response to Mr. Alvarado's filing, as well as several under seal filings by Ms. Parker and Mr.

---

[1] Unless otherwise noted, all docket citations refer to 04-0098.

McCoy, on May 19, 2006 the Court issued an Order Re: Representation of Plaintiffs.  Docket No. 404.

That order stated,

> The Court has received conflicting submissions from plaintiffs and counsel regarding who is representing the remaining plaintiffs in this case.  Due to the confused state of the record, the Court hereby orders as follows: Docket Nos. 397, 398 and 400 (all filed under seal) are REMOVED from the file and shall be returned to Ms. Parker; docket Nos. 381-389 and 393 are REMOVED from the file and shall be returned to Mr. McCoy.
>
> The Court further orders that by June 2, 2006, each individual plaintiff who remains in this action . . . shall file a statement with the Court regarding who they wish to represent them. . . .

*Id*. & Docket No. 405.

On June 1, 2006, each of the remaining plaintiffs, including Mr. Alvarado, filed a Notice of Termination of Attorney Kay McKenzie Parker.  Docket Nos. 409-18.  Each Notice was identically worded and stated,

> I, a Plaintiff in the matter *Alvarado et al. v. FedEx*, hereby terminate Kay McKenzie Parker as my attorney of record in this matter.  Ms. McKenzie Parker's business address is 703 Market Street, Suite 1401, San Francisco, Ca 94103.  From this date forward, my only attorney of record in this case is Waukeen McCoy, and the Law Offices of Waukeen Q. McCoy at 703 Market St., Suite 1407, San Francisco, CA 94103.  Please allow the court docket to reflect this fact.

Docket No. 409.  On July 19, 2006, the Court signed orders granting plaintiffs' requests to terminate Ms. Parker as counsel.  Docket Nos. 449-57 in 04-0098; Docket No. 247 in 04-0099.


## II.       Trial and settlement

After firing Ms. Parker, three plaintiffs (Edward Alvarado, Pernell Evans, and Charlotte Boswell) proceeded to trial, represented by Mr. McCoy and his office.  All three plaintiffs prevailed at trial: in September 2006, a jury awarded Mr. Alvarado $500,000 on his retaliation claim; in November 2006, a jury awarded Mr. Evans $950,000 on his claims of retaliation and discrimination; and in April 2007, a jury awarded Ms. Boswell $3 million on her claims for sexual harassment, retaliation, and constructive discharge.[2]

---

[2]  In post-trial orders filed on March 18, 2008, the Court remitted Mr. Alvarado's damages to $300,000; granted judgment as a matter of law in favor of FedEx and against Mr. Evans; and applied the Title VII $300,000 cap to Ms. Boswell's punitive damages award, thus reducing her total damages

United States District Court
For the Northern District of California

In November 2007, the seven remaining plaintiffs reached settlements with FedEx ("settlement plaintiffs").[3] Mr. McCoy and his office represented the plaintiffs in the settlement negotiations. Each plaintiff signed identical settlement agreements, save for the amount of the settlement, and each agreement defines "Releasing Party" as the plaintiff and "[HIS or HER] heirs, successors, administrators, agents or representatives, and attorneys in this matter . . . ." Settlement Agreement ¶ 2, Douglas Decl., Docket No. 980, Ex. 1-7. The settlement agreements release all claims for attorneys' fees, including any claims by Ms. Parker for her fees and costs:

> . . . Releasing Party knowingly, willingly, and voluntarily releases and waives all rights to, and claims for monetary relief or individual equitable relief for HIMSELF . . . against Released Parties regarding any aspect of HIS employment with FedEx Express, the subsequent ending of that employment, and any other events occurring prior to, and including, the effective date of this Agreement . . . These rights and claims for monetary relief or individual equitable relief include, but are not limited to . . . any or all rights or claims for monetary relief or individual equitable relief under any federal, state, or local statutes, or under common law, *including any claims for attorneys' fees and/or costs.*

Settlement Agreement ¶ 5 (emphasis added). Paragraph 8 of the settlement agreements provides that "each party will bear its own costs, including attorney's fees, arising from this action." *Id.* ¶ 8. Paragraph 18 of the settlement agreements states "Releasing Party warrants and represents that HE is fully entitled to give this complete release and discharge, and that HE is fully aware of all facts and rights to HIS claims." *Id.* ¶ 18. Paragraph 21 of the settlement agreements provides a contractual right to indemnification by FedEx against the settlement plaintiffs in the event that litigation continues:

> Releasing Party agrees never to institute, directly or indirectly, any proceeding of any kind against Released Parties based on, arising out of, or as a consequence of Releasing Party's employment with FedEx Express or the termination of that employment. If Releasing Party does file or institute, either directly or indirectly, any lawsuit or proceeding of any kind against Released Parties on account of any matters which can be waived by law and over which HE has waived HIS rights in this Agreement, Releasing Party agrees to indemnify and hold Released Parties harmless from damages or costs incurred by Released Parties as a result of HIS actions, including any costs, expenses, and reasonable attorneys' fees incurred by Released Parties. Thus, based on this provision, should the Court decline to award declaratory relief, FedEx will have the right

---

to $850,000. Docket Nos. 1035-37. Mr. Alvarado and Ms. Boswell, currently represented by different counsel, have appealed. Mr. Evans filed a notice of appeal that was dismissed as untimely by the Ninth Circuit. Ms. Parker is also seeking fees for the work she performed on behalf of Mr. Alvarado and Ms. Boswell; those matters are currently pending before the Special Master and not at issue in this order.

[3] The seven "settlement plaintiffs" are Tanda Brown, LaSonia Walker, Kevin Neely, Dyronn Theodore, Alex Rivera, Janice Lewis, and Bertha Duenas.

1    to sue the Settlement Plaintiffs for indemnification.

2  *Id.* ¶ 21.  The settlement agreements are signed by the settling plaintiffs and Mr. McCoy.  Underneath

3  Mr. McCoy's signature the agreements state:

4         I, Waukeen Q. McCoy, of the Law Offices of Waukeen Q. McCoy, do hereby
          acknowledge full and complete satisfaction of any claim for attorneys' fees and costs
5         regarding this matter and certify that to my knowledge no other attorney or firm or other
          entity has a claim for attorneys' fees and costs in this matter except those claims that
6         have been filed with the Court by Kay Parker and Michael Cael Davis.

7  *Id.* at 7.

8

9  **III.    Interpleader**

10       After finalizing the settlements, FedEx filed a motion for counterclaim and interpleader relief.

11  Docket No. 955.  FedEx sought to interplead 40% of the settlement funds to protect itself against

12  multiple claims from various people who have filed liens in this case.  Ms. Parker filed a "conditional

13  acceptance" of the interpleader, stating that she did not waive her right to seek fees directly from FedEx.

14  Docket No. 958.  Lienholder Carlene Young (an expert retained by plaintiffs) and lienholder Michael

15  Davis filed statements of nonopposition to the interpleader.  Docket Nos. 969 & 998.  Plaintiffs filed

16  a response to FedEx's interpleader motion, stating that "Plaintiffs do not oppose the interpleader of the

17  amount in controversy: 40% of the settlement funds . . . [and] the remaining 60% is uncontested and

18  should be immediately disbursed to the order of Plaintiffs."  Docket No. 974 at 2.

19       On December 14, 2007, the Court held a hearing on defendant's motion.  In response to

20  argument by Ms. Parker's counsel (Mr. Rosen) that the Court should interplead 100% of the settlement

21  funds because of the possibility that, *inter alia*, Mr. McCoy had secret "side agreements" with the

22  settlement plaintiffs regarding the allocation of settlement monies, the Court engaged in the following

23  colloquy with Mr. McCoy:

24         The Court:      All right.  My question to you is, do you – will you receive any money from the

25                         Plaintiffs from their 60 percent, as you have put it, of the proceeds here?

26         Mr. McCoy:   No.

27         The Court:      Anything?  A dime, a penny?

28         Mr. McCoy:   No.  Absolutely not.

**United States District Court**
For the Northern District of California

| | | |
|---|---|---|
| The Court: | Would you be willing to put a declaration to that effect? |
| Mr. McCoy: | I would be willing to put a declaration to that effect, Your Honor. |
| The Court: | How many Plaintiffs are there?  Seven? |
| Mr. McCoy: | There's seven. |
| The Court: | And could I get a declaration from each of them as well? |
| Mr. McCoy: | Sure. |
| The Court: | That they're not going to give that money back to you for any purpose, |
| or | to pay costs, or for any reason at all? |
| Mr. McCoy: | I can do that, Your Honor. |
| The Court: | Would that satisfy at least that one issue, in your mind? |
| Mr. Rosen: | Yes, Your Honor. |
| The Court: | Okay.  If you do that, Mr. McCoy, that will help me a lot in deciding the pending motion. |
| Mr. McCoy: | Okay.  Sure.  I'll do that, Your Honor.  I'll get declarations from all the clients, saying that they have no side agreements with me to pay me anything besides what's in my contact, which is the 40 percent of attorneys' fees. |

Transcript of Proceedings at 22:13-23:16 (Docket No. 995).

After the December 14, 2007 hearing, Mr. McCoy and the seven settlement plaintiffs filed sworn declarations stating that the settlement plaintiffs would each receive a full 60% of their respective settlement amounts and were not paying any additional money beyond a maximum of 40% of the settlement amount to Mr. McCoy for attorneys' fees or costs.  Docket Nos. 984 (Janice Lewis, Bertha Duenas, and Kevin Neely); 987 (Tanda Brown, Lasonia Walker); 989 (Dyronn Theodore); 1002 (Alex Rivera).  Mr. McCoy also filed a declaration, which states:

I, WAUKEEN McCOY, declare and certify as follows:

. . .

3.      My fee agreements with the Plaintiffs in this matter requires the client to pay the costs incurred in bringing this case.

8

United States District Court
For the Northern District of California

4.     In order to facilitate the speedy payment of sums due to Plaintiffs under those fee agreements and their settlement agreements with FedEx, I agreed to waive my rights to costs from the Plaintiffs who settled their cases with FedEx herein.

5.     As a result, each of my clients who have settled their cases will be paid the full 60% of their settlement in this matter with no subtraction or withholding of costs, fees, or any other sum however denominated.

6.     I have not entered into any other agreement of any kind with any person, including any and all attorneys, concerning the proceeds of my clients' settlement in this matter.

7.     I am aware of no other agreements which would impact the receipt of my clients of the full 60% of their settlement amounts.

8.     I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Docket No. 983.

On February 4, 2008 the Court granted defendant's motion in part and interplead 50% of the settlement funds ($749,500.00).[4]  Docket No. 1008.  On February 14, 2008, the Court amended the order to join Angela Alioto, a judgment-creditor of Mr. McCoy, as an additional lienholder.  Docket No. 1018. On May 2, 2008, plaintiffs entered into a stipulation with one lienholder, Michael Davis, to disburse $48,000 from the interplead funds to Davis.  Docket No. 1099.

**IV.     Ms. Parker's fee motions**

After plaintiffs Alvarado, Evans and Boswell prevailed at trial, both Ms. Parker and Mr. McCoy filed motions for attorneys' fees under FEHA.  Those matters were referred to the Special Master for decision in the first instance.  Among other issues, the parties litigated the question of whether Ms. Parker had standing to seek fees for work that she performed for the judgment plaintiffs prior to her termination.[5]  In the fee proceedings before the Special Master, Ms. Parker submitted "an exemplar of

---

[4]  The Court interplead 50% of the funds because at that time it was unclear whether the lienholders' claims might exceed 40% of the funds.

[5]  The Special Master found, as did the Court on review of the Special Master's order, that Mr. McCoy made numerous misrepresentations to the Court in connection with those fee petitions.  In an order filed on March 19, 2009, the Court sanctioned Mr. McCoy and struck his fee petitions for work performed for Mr. Alvarado and Ms. Boswell.  Docket No. 1353.

the form agreement that was signed by all Plaintiffs." Parker Decl. Ex. A, Docket No. 932.[6] The form agreement states, *inter alia*, "We have agreed to the following attorney fee arrangement . . . 40% of any amounts received or recovered by way of settlement after arbitration, mediation or trial." *Id*. at 1. The agreement also states that "You hereby grant us a lien on any and all claims, causes of action, judgments or settlements that are the subject of my representation under this agreement. Our lien will be for any sums due and owing to me at the conclusion of our services. The lien will attach to any recovery you may obtain, whether arbitration award, judgment, settlement or otherwise." *Id*. at 2.

In an April 7, 2008 order, the Special Master found that the fee agreements did not address the issue of statutory fees after a trial, and instead "on their face, the contracts appear to address only what the attorneys will receive 'by way of settlement.'" Special Master's Order at 11, Docket No. 1062. The Special Master found that Ms. Parker had standing under FEHA to seek her reasonable attorneys' fees and costs on behalf of the judgment plaintiffs, and that she had standing to seek those fees and costs directly from FedEx. *Id*. at 14. The Special Master found that "none of the agreements between [the judgment] plaintiffs and counsel have the effect of assigning statutory fees to the clients or of assigning them to McCoy at the exclusion of Parker, and that the existence of a contract also does not deprive Parker of standing. Pursuant to *Flannery* [*v. Prentice*, 26 Cal. 4th 572 (2001)] and *Lindelli* [*v. Town of San Anselmo*, 139 Cal. App. 4th 1499 (2006)], Parker has standing to seek fees in *Alvarado* and *Boswell*." *Id*. at 14-15. The Special Master also found that Ms. Parker did not have standing to seek statutory fees from FedEx under a *quantum meruit* theory. *Id*. at 17. This Court adopted these findings in an order filed June 5, 2008. Docket No. 1145.

Ms. Parker then wished to seek statutory FEHA fees from FedEx with respect to the seven settlement plaintiffs. Ms. Parker contended that she was not bound by the settlement agreements' release of attorneys' fees and costs because neither the plaintiffs nor Mr. McCoy represented her interests in the settlement negotiations, and the parties excluded her from the settlement process. Ms. Parker also contended that she had the right to seek fees directly from FedEx under FEHA, and she relied on the Special Master's order (and this Court's adoption of that order) finding that Ms. Parker has

---

[6] The fee agreements are discussed in greater detail *infra*.

United States District Court
For the Northern District of California

standing under FEHA to seek fees directly from FedEx for the work she performed on behalf of the judgment plaintiffs. In response, FedEx filed a motion for declaratory relief seeking an order that Ms. Parker had no right to fees from FedEx. Docket No. 1163. In an order filed January 27, 2009, the Court granted FedEx's motion for declaratory relief, and held that Ms. Parker could not seek statutory fees under FEHA from FedEx with regard to the seven settlement plaintiffs:

> Assuming arguendo that Ms. Parker is not bound by the settlement agreements, the Court nevertheless concludes that she may not seek fees directly from FedEx. In *Flannery v. Prentice*, the California Supreme Court held that "attorney fees awarded pursuant to [FEHA] (exceeding fees already paid) belong, absent an enforceable agreement to the contrary, to the attorneys who labored to earn them." 26 Cal. 4th at 590. Here, as the Special Master noted in his order, the fee agreements expressly address fee arrangements in the event of a settlement, and under those agreements the attorneys shall recover "40% of any amounts received or recovered by way of settlement after arbitration, mediation, or trial." The Court concludes that these agreements constitute an "agreement to the contrary" under *Flannery*, and thus Ms. Parker does not have standing to seek fees under FEHA directly from FedEx.
>
> To the extent Ms. Parker is entitled to fees, she may seek them from her former clients under *quantum meruit*. In *Fracasse v. Ray Raka Brent*, 6 Cal. 3d 784 (1972), the California Supreme Court held that an attorney retained under a contingent fee agreement and then discharged with or without cause is to be compensated in the amount of the reasonable value of her services rendered to the time of discharge. The Court also noted, "To the extent that such a discharge is followed by the retention of another attorney, the client will, in any event be required, out of any recovery, to pay the former attorney for the reasonable value of his services. Such payment, in addition to the fee charged by the second attorney, should certainly operate as a self-limiting factor on the number of attorneys so discharged." *Id.* at 791. The Court found that its ruling "preserve[s] the client's right to discharge his attorney without undue restriction, and yet acknowledge[s] the attorney's right to fair compensation for work performed." *Id.*; *see also Madirossian & Assoc., Inc. v. Ersoff*, 153 Cal. App. 4th 257, 272 (2007) ("It is well settled that a contingency fee lawyer discharged prior to settlement may recover in quantum meruit for the reasonable value of services rendered up to the time of discharge."); *Di Loreto v. O'Neill*, 1 Cal. App. 4th 149, 156-57 (1991) ("[Where] the contingent fee is insufficient to meet the quantum meruit claims of both discharged and existing counsel, the proper application of the *Fracasse* rule is to use an appropriate pro rata formula which distributes the contingent fee among all discharged and existing attorneys in proportion to the time spent on the case by each. Such a formula insures that each attorney is compensated in accordance with work performed, as contemplated by *Fracasse*, while assuring that the client will not be forced to make a double payment of fees.").

January 27, 2009 Order at 5-7 (internal footnotes omitted). Docket No. 1279.

## V.     April 23, 2009 evidentiary hearing

On February 4, 2009, plaintiffs – through Mr. McCoy as a "cross-defendant" – filed a motion to dismiss the interpleader and immediately release the funds to the seven settlement plaintiffs and Mr.

McCoy.  Prior to the February 25, 2009 hearing, plaintiff Kevin Neely sent a letter to the Court.  Docket No. 1313.[7]  That letter requested that the Court not release the interpled funds to Mr. McCoy's trust account, claimed that Mr. McCoy had taken $15,000 each from the settlements of Tanda Brown, LaSonia Walker and Bertha Duenas, and accused Mr. McCoy of trying to extort extra money from the clients.

FedEx and the lienholders opposed Mr. McCoy's motion to dismiss the interpleader.  By order filed February 25, 2009, the Court denied Mr. McCoy's motion and set a schedule for resolving all issues related to the interpled funds.  Docket No. 1314.  That order directed all parties and lienholders with an interest in the interpled funds to file their claims, with supporting documentation, by March 13, 2009.

Lienholders Dr. Carlene Young and Angela Alioto filed timely motions for release of funds (Docket Nos. 1336 & 1342), and Ms. Parker filed a timely claim and declarations in support of her claim.  FedEx also filed a claim to the interpleader, requesting that the Court set aside a portion of the interpled funds on the ground that Ms. Parker's appeal of this Court's order holding that she cannot seek statutory FEHA fees from FedEx related to the settlement plaintiffs implicated the settlement agreements' indemnification provision.

Mr. McCoy did not file a claim by March 13, 2009, and instead filed a notice of appeal of the February 25, 2009 order.  Mr. McCoy also filed a "response" to the interpleader claims and motions contending that the appeal divested this Court of jurisdiction over the interpled funds, and requesting that the Court stay all proceedings related to the interpled funds until the Ninth Circuit resolved the appeal.  Docket No. 1374.  By order filed April 17, 2009, the Court found that the appeal did not divest this Court of jurisdiction, and denied Mr. McCoy's motion for a stay.  Docket No. 1383.  The order also

---

[7] On February 2, 2009, the Court also received a letter from "clients" that was addressed to the undersigned judge, and copied to counsel for FedEx and Ms. Parker.  Docket No. 1294.  That letter also claimed that Mr. McCoy had Ms. Brown, Ms. Duenas, and Ms. Walker deliver him cash money from their settlement proceeds.  At the February 25, 2009 hearing, Mr. McCoy stated that he was "looking into a claim of defamation against whoever wrote the first ["client"] letter, which is not signed by anybody, and then the second letter [Mr. Neely's February 25, 2009 letter] because they're false and they're silly."  February 25, 2009 Transcript at 12:18-22 (Docket No. 1323).  At the April 23, 2009 evidentiary hearing, Mr. Neely testified that he wrote the February 25, 2009 letter.  All of the plaintiffs stated that they did not write the "client" letter.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

noted that Mr. McCoy had not filed a claim, and that in the absence of a claim filed by Mr. McCoy, it would be very difficult for the Court to determine Mr. McCoy's entitlement to any of the interpled funds. The order stated that if Mr. McCoy wished to file a claim for payment of attorneys' fees related to the settlement plaintiffs, he needed to file a claim and any supporting documentation by April 21, 2009. *Id.* On April 21, 2009, attorney Jonathan Bass entered an appearance as counsel for Mr. McCoy in the interpleader proceedings. Docket No. 1385. On April 21, 2009, Mr. McCoy filed a claim to the interpled funds. Docket No. 1393. On April 22, 2009, the Ninth Circuit dismissed Mr. McCoy's appeal for lack of jurisdiction.

On April 23, 2009, the Court held an evidentiary hearing. Present were Mr. Bass appearing for Mr. McCoy, Ms. Parker and her counsel, Dr. Carlene Young and her counsel, counsel for FedEx, counsel for Angela Alioto, six of the settlement plaintiffs (Tanda Brown, Kevin Neely, Bertha Duenas, LaSonia Walker, Janice Lewis, and Dyronn Theodore), and plaintiffs Pernell Evans and Charlotte Boswell. Mr. McCoy did not attend the hearing.

At the hearing, the settlement plaintiffs were sworn in and provided the following testimony in response to questioning from the Court about whether they paid Mr. McCoy any money.[8] Ms. Brown testified,

> MS. BROWN:  When we – when Mr. McCoy distributed the [settlement] checks,[9] he called me to his office to actually give him my check from Federal Express. I wasn't present for the December 2007 hearing in regards to the declaration. The way the declaration was explained to me was that he was pretty much doing us a

---

[8] In response to questioning from FedEx's counsel about whether Mr. McCoy still represented the settlement plaintiffs, the settlement plaintiffs present at the hearing stated that "we all are still in agreement with Mr. McCoy under the assumption that – well, he is still our lawyer, but I think that we all agree that perhaps we didn't want him to be our lawyer, but because we were here, we didn't want any further liens on any monies that we might have coming to us. So, we continued to keep him as our lawyer instead of starting over or getting another lawyer." April 23, 2009 Transcript at 54:13-21; *see also id.* at 54:21-56-19 (Docket No. 1442).

[9] When the settlement checks were originally disbursed, each check was made out solely in the name of each settlement plaintiff – per the direction of the Court – and the checks were sent to Mr. McCoy's office for distribution.

1   favor in agreeing to the declaration.  And as a result of that, he

2   would trust us to pay him fees that would – was owed to him in

3   order for the monies to be released through the Court.  So, when

4   the check was actually in his office, he asked me to come over,

5   and he instructed me to open up an account with Bank of

6   America so the monies would be released faster.  I asked him if

7   he could receive a cashier's check in lieu of the cash, and he said

8   no, it needed to be cash.  When I went to Bank of America, they

9   – I guess this was an unusual request, so they kind of hesitated

10  with that.  I called Mr. McCoy back on the phone and asked him

11  again if it did need to be in fact, in cash, and he said it did, a

12  cashier's check wouldn't do.  That took a couple of days.  And I

13  went back to Bank of America, I don't remember the exact dates,

14  it was in March.

15  THE COURT:          March of what year?

16  MS. BROWN:          2008 . . . Actually, I have a copy of the check that I wrote to

17  Bank of America here, and the money was released on March

18  3rd, 2008.  And Mr. McCoy met me at Bank of America with the

19  cash because I was uncomfortable walking down the street with

20  that much money, and I gave him the cash.

21  THE COURT:          And is that a copy of –

22  MS. BROWN:          This is a copy of the check that was – that I wrote on my account

23  to release the cash with Bank of America.

24  THE COURT:          To release the $15,000?

25  MS. BROWN:          That's correct.

26  . . .

27  THE COURT:          So start again about the B of A account.  The settlement check

28  was available for you and made out to you, and then what

14

United States District Court
For the Northern District of California

1          happened?

2    MS. BROWN:          And Mr. McCoy suggested that I open up a B of A account

3                        because the check itself was drawn on a B of A account.  And he

4                        let me know, then, that the monies would be released faster if I

5                        would open up an account.  I had never had a B of A account up

6                        to that point, so that's what I did in order for the money to be

7                        released so he could receive his money fast.

8    THE COURT:          And then do you recall what day it was that you met Mr. McCoy

9                        and gave him the $15,000?

10   MS. BROWN:          The day of that check.

11   THE COURT:          March 3rd.

12   MS. BROWN:          Yes, March 3rd.

13   THE COURT:          Okay.  And what – did he tell you what the money was for?

14   MS. BROWN:          Fees.

15   THE COURT:          Fees, okay.

16   MS. BROWN:          Yes.

17   April 23, 2009 Transcript at 8:4-10:16 (Docket No. 1442, Ex. A); Docket No. 1402 (copy of Ms.

18   Brown's check dated March 3, 2008, made out to Tanda Brown in the amount of $15,500; receipt from

19   Bank of America dated March 3, 2008 for $15,000).

20       Next, Ms. Walker testified.

21   THE COURT:           I basically have the same questions for you, ma'am, as I did for

22                        Ms. Brown.

23   MS. WALKER:         Well, like Tanda said, that we were informed of the monies that

24                        we – that we were awarded, and we were to come to his office to

25                        pick the check up.  And he told me specifically that we needed to

26                        pay him fees, he gave me an amount of $17,000, and that I

27                        needed to pay it in cash.  And my question was why, why do we

28                        have to pay him in cash?  He said because he did us a favor by –

15

| | | |
|---|---|---|
| 1 | | he said that he waived his fees to the Court and that he would not |
| 2 | | be getting those fees and that we were to pay him cash.  At the |
| 3 | | time, I gave him – I gave him the cash and I inquired about the |
| 4 | | other plaintiffs. |
| 5 | THE COURT: | Well, how, when you say at that time you gave him the cash, |
| 6 | | what did you do, mechanically? |
| 7 | MS. WALKER: | Okay.  I went to – I had an account with B of A already.  I went |
| 8 | | to B of A and tried to see if I can get my – the check cashed and |
| 9 | | take the $15,000 out.  They told me they couldn't do that, I had |
| 10 | | to give them notice.  So then, I went to – it was a newly-opened |
| 11 | | account, not that day.  So, I went to my previous credit union to |
| 12 | | see if they could release the funds that day, they couldn't do it |
| 13 | | that day, either.  So I had to come back that next day.  They said |
| 14 | | to give them 24-hour notice.  So I came back that next day, and– |
| 15 | THE COURT: | To the credit union? |
| 16 | MS. WALKER: | To the credit union.  To the credit union.  And that is where they |
| 17 | | released the cash to me the next day. |
| 18 | THE COURT: | So you got $17,000? |
| 19 | MS. WALKER: | He told me I owed 17.  No, Your Honor, he said I owed 17, but |
| 20 | | that I could give him the 15 that day, and then when we got the |
| 21 | | prior money that I could finish paying him. |
| 22 | THE COURT: | So you got $15,000 in cash from your credit union. |
| 23 | MS. WALKER: | Absolutely. |
| 24 | THE COURT: | From money that you previously had in the bank? |
| 25 | MS. WALKER: | No, from the checks.  But they had to hold it for 24 hours. |
| 26 | THE COURT: | Yes.  And then, how did you get the cash to him? |
| 27 | MS. WALKER: | I came back over here and got the cash and walked into his office. |
| 28 | THE COURT: | Was it the credit union – |

16

| | | |
|---|---|---|
| 1 | MS. WALKER: | Patelco Credit Union on Second Street, or something. |
| 2 | THE COURT: | So, you got the cash from them and then walked it over to his |
| 3 | | office? |
| 4 | MS. WALKER: | Got the cash from the credit union, walked it over to his office, |
| 5 | | and gave it to him in an envelope. |
| 6 | THE COURT: | And that was what day, ma'am, do you remember? |
| 7 | MS. WALKER: | On or about February 10th, or something like that. |
| 8 | THE COURT: | Of '08? |
| 9 | MS. WALKER: | Of '08, yes.  My statement is saying the 8th, but that could just |
| 10 | | have been the day that check cleared. |
| 11 | THE COURT: | Do you have any papers with you today? |
| 12 | MS. WALKER: | Yes, ma'am. . . . I have the statement here, Your Honor, yes, |
| 13 | | ma'am. |
| 14 | THE COURT: | So show me where the $15,000 is. |
| 15 | MS. WALKER: | 4/8 withdrawal, 4/08.  Mine should say Patelco Credit Union. |
| 16 | THE COURT: | I see a $10,000 entry. |
| 17 | MS. WALKER: | And then, there is a five right underneath that, Your Honor. |
| 18 | THE COURT: | That looks like $500. |
| 19 | MS. WALKER: | Yes, five and then the ten – I'm sorry.  Exactly, exactly.  I'm |
| 20 | | sorry, Your Honor, ten, five, that's right. |
| 21 | THE COURT: | So it was $10,500. |
| 22 | MS. WALKER: | Yes, Your Honor.  I'm sorry.  I'm sorry.  It was a lot of cash. |
| 23 | THE COURT: | Did he give you a receipt of any kind? |
| 24 | MS. WALKER: | No, ma'am he did not. |
| 25 | THE COURT: | Ms. Brown, did he give you a receipt of any kind? |
| 26 | MS. BROWN: | (Shaking head.) |

27   April 23, 2009 Transcript at 13:22-17:9 (Docket No. 1442); Docket No. 1402 (Ms. Walker's April 2008

28   Patelco statement showing a $10,000 withdrawal on April 10, 2008 and a $500 withdrawal on April 11,

United States District Court
For the Northern District of California

1    2008).

2    Ms. Duenas also testified:

3    THE COURT:              I have the same questions for you, ma'am: Did you wind up

4                                   giving cash money to Mr. –

5    MS. DUENAS:            Yes, I did.  I gave him $15,000 cash in February.

6    THE COURT:              And what – how did that happen?  What happened?

7    MS. DUENAS:            After we got paid from Federal Express, I got two checks, one for

8                                   20 – no, $15,000-plus and one for $100,000.  Waukeen asked me

9                                   to give him some fees of $15,000.  So what I did, I went to the –

10                                  my Wells Fargo and deposited the $15,000 check plus.  And I had

11                                  to wait about ten days to withdraw the cash because he requested

12                                  it right away, but I had to wait at least ten days for the check to

13                                  clear.  And I withdraw the check – I mean, the cash, and I came

14                                  and drop it off.  And I met him on Market.  And I believe the

15                                  place was McDonald's, right on the corner.  And I gave him – I

16                                  mean, I gave him $15,000 cash.   And here is a copy of the

17                                  withdrawal. . .  That was withdrawn on February 26.

18    . . .

19    THE COURT:              Oh, okay, thanks.  So now I'm with all of you on this.  So I see

20                                  that there is – you deposited $100,000, 5 –

21    MS. DUENAS:            Right, that's one of the checks.

22    THE COURT:              And then you withdrew the $15,000.

23    MS. DUENAS:            Correct.

24    THE COURT:              And that withdrawal, it looks like it was made on March 24th; is

25                                  that right?

26    MS. DUENAS:            Looks like – it says 26th.  It was right after they gave us the

27                                  check on deposit, and there was, like, ten days later.

28    THE COURT:              Okay, so you went into the bank to do the withdrawal –

United States District Court
For the Northern District of California

18

United States District Court

For the Northern District of California

| | | |
|---|---|---|
| 1 | MS. DUENAS: | Correct. |
| 2 | THE COURT: | And they gave you the money. |
| 3 | MS. DUENAS: | Correct. |
| 4 | THE COURT: | And then, that same day, did you meet Mr. McCoy at |
| 5 | | McDonald's? |
| 6 | MS. DUENAS: | Yes, I did.  I took BART, and I met him on Market Street.  I |
| 7 | | believe it was McDonald's, the restaurant, and went inside.  I met |
| 8 | | him there and went to his car and gave him the envelope with the |
| 9 | | cash. |
| 10 | THE COURT: | Did he give you a receipt? |
| 11 | MS. DUENAS: | No, he did not. |

April 23, 2009 Transcript at 17:19-19:12 (Docket No. 1442); Docket No. 1402 (Ms. Duenas' Wells

Fargo Bank statement for February 27 - March 25, 2008 showing $15,000 withdrawal on March 24,

2008).

Plaintiff Kevin Neely testified that although Mr. McCoy did not ask Mr. Neely to pay him any

money out of the settlement proceeds, Mr. McCoy did inform Mr. Neely that litigation costs would be

deducted.  Mr. Neely testified that when Mr. McCoy mailed him the settlement check, Mr. McCoy also

enclosed a letter stating,

> Dear Mr. Neely,
>
> Attached, please find payments reflecting the settlement of the above-captioned matter
> with FedEx.  The expenses of litigation which you owe pursuant to contract was [sic] not
> taken out of the amounts provided to you pursuant to the Court's order dated Feb. 4,
> 2008.  At the release of the remaining funds costs will be deducted.
>
> Congratulations.

Docket No. 1401 (letter dated February 20, 2008 from Mr. McCoy to Mr. Neely).  Mr. Neely testified,

| | | |
|---|---|---|
| | MR. NEELY: | When I questioned Mr. McCoy's actions, fees that I felt like he |
| | | was not entitled to, especially after he signed a declaration stating |
| | | he wouldn't take any more money from us, he then sent another |
| | | letter, approximately 15, 20 days later, stating that he would be |

19

1    entitled to my full 60 percent and that he would ask the Court to

2    relieve him of his waiver so he can pursue other means.

3   April 23, 2009 Transcript at 60:4-10 (Docket No. 1422).  That letter, which Mr. Neely submitted at the

4   hearing, states,

5       Dear Mr. Neely,

6       This letter serves to memorialize the voicemail that I left with you today, clarifying the
        letter that was written on February 20, 2008.  As you know I waived all costs and you
7       are entitled to the full 60% of your settlement funds pursuant to Court Order.  However,
        I am going to request to the Court, after all settlement funds are disbursed and it is
8       proved that all of the liens are invalid, that the Court would relieve me of my waiver.
        As you know, you do not have to support me in that request.  In you have any questions
9       or concerns please feel free to contact me at your earliest convenience.

10  Docket No. 1401 (letter dated March 5, 2008 from Mr. McCoy to Mr. Neely).

11      Another plaintiff, Dyronn Theodore, also testified that the day he went to pick up his settlement

12  check from Mr. McCoy's office, Mr. McCoy asked him for a payment.

13      THE COURT:          Okay, so Mr. Theodore, you can tell me anything you want, but

14                          I'm particularly concerned whether Mr. McCoy requested cash

15                          from you after you received your settlement.

16      MR. THEODORE:       Yes, he requested cash of me, but I told him I didn't have it, and

17                          that I was giving my mother half of my money, and I couldn't

18                          afford to give him anything.

19      THE COURT:          Was it – was it orally or was it in the letter, or how did he ask

20                          you?

21      MR. THEODORE:       No, I just told him.

22      THE COURT:          How did he ask you?

23      MR. THEODORE:       He told me whatever I can give him to give him, but I told him I

24                          couldn't afford to give him anything.

25      THE COURT:          Did he ask you for a specific number?

26      MR. THEODORE:       No.  No, ma'am.  He was just like, whatever you can afford.

27      . . .

28      THE COURT:          And when did this happen?

20

United States District Court
For the Northern District of California

| | | |
|---|---|---|
| 1 | MR. THEODORE: | The day that I went to pick up my – the monies. |
| 2 | THE COURT: | Uh-huh. |
| 3 | MR. THEODORE: | The day that I went there, he was just like, whatever you can |
| 4 | | afford to give him.  And, I was, like, I don't have anything |
| 5 | | because I already made an agreement with my mother whatever |
| 6 | | ever I was getting that I was going to give her half of whatever I |
| 7 | | got.  And then he said something about, like, if I were to get some |
| 8 | | more money coming back he will call me and let me know, or |
| 9 | | something like that, but, no call, no nothing. |

April 23, 2009 Transcript at 60:18-61:23.

Ms. Lewis also testified that Mr. McCoy asked her to pay him money from her settlement proceeds.

| | | |
|---|---|---|
| 13 | THE COURT: | And Ms. Lewis? |
| 14 | MS. LEWIS: | Yes, he did.  The day that I went to go pick up my check, |
| 15 | | Waukeen told me that I owed him $17,000, and that he would |
| 16 | | want that money then.  And, before he would issue the check to |
| 17 | | me, he gave me this letter.  And I'll go get it.[10] |
| 18 | THE COURT: | Okay. |
| 19 | MS. LEWIS: | And then he came back and said we had a misunderstanding, |
| 20 | | that's not what I said.  But I clearly heard exactly what he said, |
| 21 | | that I owed him $17,000, and he would like that money. |
| 22 | THE COURT: | And what did you say to that? |
| 23 | MS. LEWIS: | I don't have $17,000.  How am I going to give you $17,000? |

*Id.* at 61:25-62:13; *see also* Docket No. 1401 (March 5, 2008 letter from Mr. McCoy to Ms. Lewis, stating that Mr. McCoy would be seeking the Court to relieve him of his waiver of costs after all settlement monies disbursed).

---

[10] The letter is dated February 20, 2008, and the text is identical to the wording of Mr. McCoy's February 20, 2008 letter to Mr. Neely.  Docket No. 1401.

United States District Court
For the Northern District of California

Several plaintiffs testified that, separately from the money they paid Mr. McCoy from the settlement checks, they had paid Mr. McCoy various amounts for "fees" over the years.  Ms. Duenas testified and submitted evidence in the form of a bank statement and receipts showing that she made three payments: a $1,000 check on January 5, 2006,[11] a $197.00 credit card payment on August 21, 2007, and $1,350.00 credit card payment on August 21, 2007.  Docket No. 1402.  Ms. Brown testified that she made payments of approximately "over a couple thousand dollars" to Mr. McCoy over the years, but that she did not bring any documentation of the payments with her to Court.  April 23, 2009 Transcript at 22:15-19.  Similarly, Ms. Walker testified that "he [Mr. McCoy] charged fees for everyone, but some of us weren't able to pay.  I think along the way, I may have given him about $1,500."  *Id.* at 23:8-11.  Ms. Walker also did not have any documentation of these payments.  All three women testified that Mr. McCoy did not provide receipts for any of these payments.  *Id.* at 21:21-13; 23:13-19.  Mr. Neely testified that he had paid Mr. McCoy approximately $7,000 over the years.  *Id.* at 59:5-9.  After the hearing, Mr. Neely filed a letter with documentation of some of these payments, which occurred in 2002 and 2005.  Docket No. 1418.

Mr. Bass, appearing for Mr. McCoy, questioned Ms. Brown, Ms. Duenas and Ms. Walker about their understanding, if any, of the distinction between "fees" and "costs," and whether they understood that under the retainer agreement, the plaintiffs were responsible for "costs."  *Id.* at 24:2-27:16.  Mr. Bass did not cross-examine plaintiffs about their testimony about the payments they made to Mr. McCoy out of their settlement proceeds, or about Mr. McCoy's requests for payment out of the settlement proceeds.

After the hearing, the parties filed supplemental briefs, and the briefing was completed on June 15, 2009.  Mr. McCoy filed supplemental papers and declarations responding to Ms. Parker's papers, but he did not file anything in response to the testimony of the plaintiffs at the evidentiary hearing.  In addition, several of the plaintiffs filed letters.  Docket Nos. 1417, 1418, 1470, 1472, & 1478.   Mr. Neely's letters (Docket Nos. 1417, 1418, and 1472) provided documentation of payments to Mr. McCoy

---

[11] The testimony about the date of this payment was somewhat confused; however, Ms. Duenas' bank statement for 12/11/05-1/10/06 shows a "Check to Waukeen McCoy" for $1,000 with a transaction date of January 5, 2006.

United States District Court
For the Northern District of California

in 2002 and 2005, inquired about the status of the interpleader proceedings, and requested that the Court award plaintiffs Mr. McCoy's attorneys' fees.  Mr. Rivera, who did not attend the April 23, 2009 hearing, sent a letter (Docket No. 1470) stating that Ms. Parker did not have a contract with plaintiffs, that Ms. Parker did not do any work for plaintiffs, defending Mr. McCoy, and accusing this Court of holding the interpled funds as "ransom in an effort to get me to say something negative about my attorney, Waukeen McCoy."  *Id*.  Ms. Brown's letter (Docket No. 1478) enclosed copies of the Notice of Termination of Ms. Parker, states that Ms. Brown and other plaintiffs have not interacted with Ms. Parker since September 2005, and states her "firm belief" that Ms. Parker was not involved with the "settlement cases."[12]

## DISCUSSION

The original amount of interpled funds was $749,000, which is 50% of the total settlement amount.  Forty percent of the total settlement amount, $599,000 (excluding interest) has been set aside for attorneys' fees, and after the $48,000 payment to plaintiffs' former attorney Michael Davis, $551,600 (excluding interest) remains of the attorneys' fees amount. Ten percent of the total settlement amount, $149,900 (excluding interest) was interpled to take account for the possibility that the claims of the various lienholders and claimants would exceed $599,000.

## I.    Ms. Parker had signed retainer agreements with each of the settlement plaintiffs

After review of the evidence in the record, the Court finds that each of the settlement plaintiffs signed retainer agreements with Mr. McCoy, and that they each signed Addendum No. 1, which added Ms. Parker as co-counsel with Mr. McCoy.  The plaintiffs also signed Addendum No. 2 which added John Burris as co-counsel with Mr. McCoy and Ms. Parker, and which affirmed that Addendum No. 1 had added Ms. Parker as co-counsel.

<u>Underlying contracts</u>: There is no dispute that each of the settlement plaintiffs signed the underlying contracts with Mr. McCoy.  These contracts are attached to the Claim of Waukeen Q.

---

[12] Mr. Neely and Ms. Brown mailed their letters directly to the Court.  Mr. Rivera's letter was filed by Mr. McCoy.

1    McCoy to Interpled Funds, Docket No. 1392.  Every contract is signed by the client, Mr. McCoy, and

2    Mr. Davis, with the exception of Ms. Duenas' contract, which is signed only by her.

3           Addendum No. 1: "Addendum No. 1 to Attorney Representation Agreement" substituted Ms.

4    Parker as co-counsel with Mr. McCoy in place of Mr. Davis.  The Addendum states, in relevant part,

5           The purpose of this Addendum No. 1 is to change the Agreement to delete Michael
            Davis and to substitute KAY McKENZIE PARKER (State Bar No. 143140) of the Law
6           Offices of Kay McKenzie Parker . . . ("CO-COUNSEL NO.1").

7           CO-COUNSEL NO. 1 shall be bound by all the same obligations and duties to CLIENT
            under the Agreement as ATTORNEY is to CLIENT.  In addition, CLIENT shall be
8           bound by all the same obligations and duties to CO-COUNSEL NO.1 as CLIENT is to
            ATTORNEY.
9
            CLIENT understands and agrees that ATTORNEY and CO-COUNSEL NO.1 will share
10          the attorneys' fees described in the Agreement.  In addition, CLIENT understands and
            agrees that ATTORNEY and CO-COUNSEL NO.1 may employ other attorneys at no
11          additional expense to CLIENT, as they deem necessary in their independent judgment,
            for the representation of CLIENT.
12
     Docket No. 587, Ex. E.
13
            Ms. Parker, Mr. McCoy, and the settlement plaintiffs dispute whether Addendum No. 1 was
14
     signed by each of the settlement plaintiffs.  Ms. Parker states that each of the settlement plaintiffs signed
15
     this Addendum:
16
            Each of the seven plaintiffs who settled their claims signed identical copies of
17          Addendum 1 to the contract, substituting me as co-counsel with Waukeen McCoy in
            place of Michael Davis [quoting Addendum].  Mr. McCoy personally handed me the
18          signed originals of Addendum 1 for each of the 16 plaintiffs, with the exception of Ms.
            Paogofie, who faxed her signed Addendum 1 directly to me. . . . As I explained in my
19          prior declarations, I no longer have copies of all of the signed Addenda 1.  I do have
            copies of some of the signed Addenda 1, those for plaintiffs Charlotte Boswell, John
20          Azzam, Charles Gibbs, Maria Munoz, Lore Paogofie, and Chris Wilkerson. . . . In
            addition, Edward Alvarado affirmed to this Court in his recently filed Amended
21          Complaint for Declaratory Relief that he signed Addendum 1.  *See* Amended Complaint
            for Declaratory Relief, ¶ 4, filed in the related action *Alvarado v. McCoy et al.*, Case No.
22          09-0485 SI (Docket No. 5).[13]

23   Docket No. 1400 ¶ 5.  Ms. Parker has also submitted a copy of Addendum No. 1 signed by judgment

24   plaintiff Charlotte Boswell.  *Id*. Ex. F.

25          Addendum No. 2: "Addendum No. 2 to Attorney Representation Agreement" added John Burris

26

27          [13] *Alvarado et al. v. McCoy et al.*, C 09-485, is a lawsuit by Mr. Alvarado and Ms. Boswell
     against Mr. McCoy, Ms. Parker, and Mr. Davis, and it seeks declaratory relief regarding a dispute
28   between the plaintiffs and their former counsel regarding attorneys' fees.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

as "CO-COUNSEL NO. 2."[14]  Addendum No. 2 affirmed that "Addendum No. 1 to the Agreement added Kay McKenzie Parker (SBN 143140) as Co-Counsel No. 1," and states that "The purpose of this Addendum No. 2 is to add to the Agreement an additional attorney representative for CLIENT, attorney John Burris . . . ."  Docket No. 1400, Ex. A.  Addendum No. 2 also states,

> CLIENT understands and agrees that ATTORNEY, CO-COUNSEL NO. 1 and CO-COUNSEL NO. 2 will share proportionately the contingency attorneys' fees described in the Agreement.  In addition, CLIENT understands and agrees that ATTORNEY and CO-COUNSEL may employ other attorneys at no additional expense to CLIENT, as they deem necessary in their independent judgment, for the representation of CLIENT.

*Id*.  Ms. Parker has submitted copies of Addendum No. 2 signed by 5 of the settlement plaintiffs: Tanda Brown, Bertha Duenas, Janice Lewis, Kevin Neely, and LaSonia Walker.  *Id*. Ex. A-E.  Ms. Parker also states in her declaration that Mr. Rivera and Mr. Theodore (and other non-settlement plaintiffs) signed Addendum No. 2.

Based upon the evidence in the record, the Court finds that Ms. Parker had fee agreements with the settlement plaintiffs.  The Court makes this finding based upon the signed copies of Addendum No. 1, the signed copies of Addendum No. 2 and the language in Addendum No. 2 affirming that "Addendum No. 1 added Kay McKenzie Parker (SBN 143140) as Co-Counsel No. 1," and Ms. Parker's sworn declaration to the Court that each of the settlement plaintiffs signed Addendum No. 1.  Further, the behavior of counsel and plaintiffs in this litigation up until the time that plaintiffs terminated Ms. Parker all support a finding that Ms. Parker and Mr. McCoy were co-counsel, and that Ms. Parker was plaintiff's attorney.

## II.    Rule 2-200

Mr. McCoy argues that Ms. Parker is barred from any recovery from the interpled funds because that would amount to fee-splitting, and Mr. McCoy and Ms. Parker never had a fee-sharing agreement.  Mr. McCoy relies on California Rule of Professional Conduct 2-200, which states that an attorney "shall not divide a fee for legal services with a lawyer who is not a partner of, associate of, or share-holder

---

[14]  Mr. Burris entered a notice of appearance in these cases on June 29, 2004 (Docket No. 30), and filed a motion to withdraw as counsel on October 14, 2005.  Docket No. 293.  The motion to withdraw was granted on November 16, 2005.  Docket No. 317.

**United States District Court**
For the Northern District of California

with the member unless . . . [t]he client has consented in writing thereto after a full disclosure has been made in writing that a division of fees will be made and the terms of such division . . . ."  Cal. R. Prof. Conduct 2-200(A).  Mr. McCoy cites cases on fee-splitting arrangements in which attorneys were barred from recovering fees under contracts between the attorneys when the fee-splitting arrangements had not been disclosed to the client, and where the client had not consented to the fee-splitting arrangement. *See Huskinson & Brown LLP v. Wolf*, 32 Cal.4th 453 (2004); *Chambers v. Kay*, 29 Cal.4th 142 (2002); *Strong v. Beydoun*, 166 Cal. App. 4th 1398 (2008).  However, as Ms. Parker correctly notes, in none of the cases cited by Mr. McCoy was there evidence that the attorney seeking fees had a contract directly with the client; instead, each of those cases involved agreements between lawyers about division of work and fees.  Here, in contrast, Ms. Parker did have contingency contracts with the settlement plaintiffs by which they retained her and Mr. McCoy as co-counsel.

In addition, none of the cases cited by Mr. McCoy holds that a discharged attorney may not recover in *quantum meruit* from the recovery obtained by their former clients, and in fact California law provides otherwise.  "[A] rule awarding a discharged attorney the reasonable value of the services [s]he has rendered up to the time of discharge preserve[s] the client's right to discharge his attorney without undue restriction, and yet acknowledge[s] the attorney's right to fair compensation for work performed." *Fracasse v. Brent*, 6 Cal.3d 784, 791 (1972); *Mardirossian & Assoc., Inc. v. Ersoff*, 153 Cal. App. 4th 257, 272 (2007) ("It is well settled that a contingency fee lawyer discharged prior to settlement may recover in *quantum meruit* for the reasonable value of services rendered up to the time of discharge."); *see also Di Loreto v. O'Neill*, 1 Cal. App. 4th 149, 156-57 (1991).  Indeed, the cases cited by Mr. McCoy recognize that discharged counsel may recover in *quantum meruit* from their former clients. *See Chambers*, 29 Cal.4th at 161; *Huskinson & Brown*, 32 Cal.4th at 458.

Thus, it is irrelevant to Ms. Parker's *quantum meruit* recovery that she and Mr. McCoy did not have an explicit fee-sharing agreement, and that they did not comply with Rule 2-200.  To the extent that Ms. Parker contends that she and Mr. McCoy did have such a fee-sharing agreement, and that this agreement was somehow disclosed to the clients via Addendum No. 1, the Court disagrees and finds these arguments unsupported by the record.

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.     Ms. Parker's *quantum meruit* recovery

#### A.     Fees and costs

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed." *Mardirossian & Associates, Inc. v. Ersoff*, 153 Cal. App. 4th 257, 272 (2007) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). "However, providing evidence as to the number of hours worked and rates claimed is not the end of the analysis in such a *quantum meruit* action. The party seeking fees must also show the total fees incurred were reasonable. Factors relevant to that determination include the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure of the attorney's efforts, the attorney's skill and learning, including his or her age and experience in the particular type of work demanded." *Id.* (citation and internal quotations omitted); *see also Di Loreto v. O'Neill*, 1 Cal. App. 4th 149, 156-57 (1991) ("[Where] the contingent fee is insufficient to meet the *quantum meruit* claims of both discharged and existing counsel, the proper application of the *Fracasse* rule is to use an appropriate pro rata formula which distributes the contingent fee among all discharged and existing attorneys in proportion to the time spent on the case by each. Such a formula insures that each attorney is compensated in accordance with work performed, as contemplated by *Fracasse*, while assuring that the client will not be forced to make a double payment of fees.").

Here, Ms. Parker claims that she is entitled to a *quantum meruit* fee of the entire sum that remains for attorneys' fees ($551,600, excluding interest), and a majority of the funds from the additional interpled funds to pay for $126,314.86 in costs. Ms. Parker has submitted declarations and evidence showing that from the inception of these cases until June 2006, she was heavily involved in the litigation. Ms. Parker conducted or defended 20 of the 33 depositions between December 2004 and August 2005, including taking the depositions of top level FedEx managers and defending the depositions of settlement plaintiffs Dyronn Theodore and LaSonia Walker. Ms. Parker also claims that Mr. McCoy was absent from this case and unavailable, conducting trials in unrelated cases, for most of

**United States District Court**
For the Northern District of California

the entire heavy litigation period in 2005. Mr. McCoy contends that he and his office performed the vast majority of the work for the settlement plaintiffs, and that Ms. Parker's work was directed primarily at the plaintiffs who lost on summary judgment.

The Court has presided over this contentious litigation from the beginning, and is very familiar with the work performed by both Ms. Parker and Mr. McCoy. The Court finds as a factual matter that for significant periods of time when these cases were being heavily litigated, Ms. Parker bore the brunt of the litigation on behalf of plaintiffs. The Court also finds that a considerable amount of Ms. Parker's work – such as taking the depositions of FedEx managers and preparing and defending expert depositions – was performed on behalf of the settlement plaintiffs. However, the Court finds that Ms. Parker's lodestar is not a proper measure of the value of her work up until the time of her termination. As the docket reflects, many of the plaintiffs' claims did not survive summary judgment, and this reflects, to a large degree, the quality of Ms. Parker's work. *See, e.g.*, Docket No. 133 in 04-0099 (Ms. Parker's opposition to FedEx's motion for summary judgment as to plaintiffs White and Rivera). Second, the Court firmly believes that it is unlikely the settlements would have been reached if not for the fact that plaintiffs Alvarado, Boswell and Evans – represented by Mr. McCoy – prevailed at trial, each with significant jury verdicts.[15] Although the Court has found that Mr. McCoy engaged in serious misconduct in these cases, the Court also finds that it was Mr. McCoy's success at trial in the Alvarado, Boswell and Evans cases that almost certainly provided the impetus for settlement. As a result, the Court concludes that Mr. McCoy should be awarded 75% of the contingency fees ($413,700 before deductions), and Ms. Parker should receive 25%, $137,900 for her fees and costs.[16] This ratio is the

---

[15] At the time the settlements were reached in November 2007, the Court had not yet ruled on any of the post-trial motions.

[16] Ms. Parker seeks a total of $126,314.86 in costs. Docket No. 1347, Ex. 4. Many of these costs are not recoverable, and/or are unreasonable. Specifically, the Court finds that $20,343.45 for "Contract Labor (legal assistants, office staff)" is overhead, and not a recoverable cost. Similarly, Ms. Parker seeks a total of $57,239.96 for "travel" related costs incurred because Ms. Parker, who resided in Fresno from 1998 through 2005, rented an apartment and office space in San Francisco in order to litigate these cases. Docket No. 1218 ¶ 8 (Parker Decl.). Ms. Parker seeks, *inter alia*, the costs of her apartment and office space rental, meals, and "telephone/data/fax lines at lodgings." Docket No. 1347, Ex. 4. These expenses are part of overhead and not recoverable costs. Other costs, such as those for expert witness fees, process servers, and deposition transcripts, are recoverable. Ms. Parker's *quantum meruit* recovery of $137,900 includes recovery of these costs.

**United States District Court**
For the Northern District of California

most equitable division of attorneys' fees that compensates the attorneys for the value of the work they performed for the settlement plaintiffs. In the Court's view, this division both recognizes the fact that Ms. Parker kept these cases going during periods of intense litigation, and also that the settlements are largely due to the efforts of Mr. McCoy in trying and prevailing in the Alvarado, Evans and Boswell cases.

### B.  Lien of Dr. Carlene Young

Lienholder Carlene Young performed expert services on behalf of the plaintiffs in this case. Dr. Young was engaged as an expert by Ms. Parker and the Law Offices of Waukeen McCoy when they were both representing plaintiffs. Dr. Young was paid her initial $2,500.00 retainer by Ms. Parker. The agreement, which was signed on November 11, 2005, by Ms. Parker on behalf of the Law Offices of Waukeen McCoy, states in pertinent part:

> This agreement is between Dr. Carlene Young and Attorney and payment for fees and expenses are the responsibility of the attorney. Attorney hereby agrees that Carlene Young has a right to file a lien in this case to recover any unpaid fees and expenses from Attorney, Plaintiffs, insurance companies or any other third party.

Young Decl. Ex. A (Docket No. 1338).

The Court finds that Mr. McCoy and Ms. Parker, and not the settlement plaintiffs, are responsible for payment of Dr. Young's bill. Mr. McCoy waived his costs, and thus he cannot shift those costs to the settlement plaintiffs. With respect to Ms. Parker, the Court finds it equitable to require her to pay a portion of Dr. Young's bill because the plaintiffs did not benefit from Dr. Young's work. By order filed June 27, 2006, the Court granted defendants' motion to strike the untimely disclosure of Dr. Young. Docket No. 427. The Court apportions Dr. Young's bill as follows: Mr. McCoy is responsible for 75% of the total bill of $50,238, and thus $37,678.50 will be deducted from Mr. McCoy's amount, and Ms. Parker is responsible for 25%, or $12,559.50. Ms. Parker already paid Dr. Young $2,500, and thus an addition $10,059.50 will be deducted from Ms. Parker's fee and cost award.

**United States District Court**
For the Northern District of California

**IV.    Mr. McCoy's attorneys' fees**

As explained above, the Court allocates $413,700 in attorneys' fees to Mr. McCoy.  However, out of that amount, there are numerous payments and deductions to be made.

**A.    Payments to Ms. Brown, Ms. Duenas and Ms. Walker**

First, the payments made by Ms. Brown, Ms. Duenas, and Ms. Walker to Mr. McCoy out of their settlement proceeds will be deducted from Mr. McCoy's fees and returned to the plaintiffs.  The Court finds the plaintiffs' testimony and evidence regarding these payments to be credible and undisputed, and the Court finds it significant that Mr. McCoy did not file any explanation or response after the April 23, 2009 evidentiary hearing, and indeed he was not even present for that hearing.  The Court further finds that Mr. McCoy demanded these payments from his clients in direct contravention of his representations to this Court that the plaintiffs would be receiving their full 60% of the settlements, that he was waiving his costs, and that the plaintiffs would not be paying him any money out of their settlement proceeds. At the December 14, 2007 hearing, the Court asked Mr. McCoy, "will you receive any money from the Plaintiffs from their 60 percent, as you have put it, of the proceeds here?" Mr. McCoy answered "no." The Court asked, "Anything?  A dime, a penny?" and Mr. McCoy responded, "No.  Absolutely not." Transcript of Proceedings at 22:13-18 (Docket No. 995).  The Court asked Mr. McCoy to file sworn declarations from himself and the settlement plaintiffs confirming that "they're not going to give that money back to you for any purpose, or to pay costs, or for any reason at all?" and Mr. McCoy responded "I can do that, Your Honor." *Id.* at 23:3-6.

The Court has no doubt that Mr. McCoy will claim on appeal and to the appropriate authorities[17] that he did not violate the letter of his carefully-worded December 19, 2007 declaration.  Regardless of whether he did or did not technically perjure himself, there is no question that Mr. McCoy violated the spirit of that declaration as well as his representations to this Court at the December 14, 2007 hearing. It was clear from the colloquy between the Court and Mr. McCoy at the December 14, 2007 hearing that the Court was concerned about whether the plaintiffs would be receiving – and keeping – the full 60%

---

[17]    By separate order, the Court will refer Mr. McCoy for investigation by the appropriate authorities.

United States District Court

For the Northern District of California

of their settlements, and that the plaintiffs would not be making any payments to Mr. McCoy out of those proceeds. Mr. McCoy certainly did not inform the Court that he required the plaintiffs to make these payments, and indeed it appears that he took every step he could, such as requiring the clients to pay him in cash and not providing receipts, to ensure that there would be no record of these payments. Accordingly, the Court orders deductions out of Mr. McCoy's attorneys' fees to repay Ms. Brown, Ms. Walker and Ms. Duenas for the payments they made him out of their settlement proceeds: $15,000 will be repaid to Ms. Brown, $10,500 will be repaid to Ms. Walker, and $15,000 will be repaid to Ms. Duenas.

The Court finds that the pre-December 2007 payments made by plaintiffs to Mr. McCoy (such as the payments made by Mr. Neely and Ms. Duenas) were not in violation of the December 2007 declaration because those payments were not made out of the settlement proceeds.


### B.    Payment of judgment creditor Angela Alioto

Second, $20,285.16 shall be deducted from Mr. McCoy's fees and disbursed to Angela Alioto to satisfy her lien. Ms. Alioto is a judgment creditor of Mr. McCoy, and Mr. McCoy does not dispute the validity of Ms. Alioto's lien.


### C.    Payment of Carlene Young

Third, as explained above, Mr. McCoy and Ms. Parker are responsible for paying the expert fees of Dr. Carlene Young. Mr. McCoy's portion of Dr. Young's payment is $37,678.50.


### D.    Payment of Special Master

The Court will also reserve $24,000 from Mr. McCoy's fees for an accounting and payment of the Special Master in this case. The Special Master was appointed after discovery in these cases became and continued to be extremely contentious. As noted *supra*, after the judgment plaintiffs prevailed at trial, the Court referred Mr. McCoy's and Ms. Parker's attorney fee petitions to the Special Master for decision in the first instance. Once the Special Master began to make findings adverse to Mr. McCoy's interests, Mr. McCoy began to object to the Special Master's appointment – such as by moving to

31

United States District Court
For the Northern District of California

1  disqualify the Special Master on the ground that he was biased – and stopped paying the Special

2  Master's bills.

3      On July 15, 2008 and March 16, 2009, the Special Master filed notices of non-payment.  Docket

4  Nos. 1181, 1349.  The Special Master stated that Mr. McCoy's unpaid balance prior to November 11,

5  2008 (the date that Mr. McCoy withdrew as counsel for plaintiffs Boswell and Alvarado) was

6  $21,186.39.  The majority of those fees were incurred in connection with litigating FedEx's successful

7  motion for sanctions against Mr. McCoy.  The notice also stated that there is the separate matter of fees

8  that accrued since Mr. McCoy withdrew.  Mr. McCoy filed objections to the notices of non-payment.

9  On March 20, 2009, the Court issued an order to show cause denying Mr. McCoy's objections, and

10  providing Mr. McCoy with notice that "the Court intends to impose liability on Mr. McCoy personally

11  for the Special Master's bills related to the sanctions matter pursuant to 28 U.S.C. § 1927. . . . For all

12  of the reasons set forth in the Court's March 19, 2009 order [Docket No. 1353], the Court finds that Mr.

13  McCoy has, in bad faith, unreasonably and vexatiously multiplied the sanctions proceedings before the

14  Special Master, and therefore that it is fair and reasonable to require Mr. McCoy to pay the Special

15  Master's fees."  Docket No. 1359 at 1:28-2:12.  The Court provided Mr. McCoy with an opportunity

16  to file a response setting forth why he should not be required to pay the Special Master's fees.  *Id.* at

17  2:13-18.

18      Mr. McCoy filed a response contending that the Court did not have jurisdiction to rule on his

19  objections to the Special Master's notices of non-payment because Mr. McCoy had appealed the Court's

20  sanctions order.  Docket No. 1362.  The Court finds that Mr. McCoy's response lacks merit.  The Court

21  will reserve $24,000 from Mr. McCoy's fees, and that money will remain interpled with the Court

22  pending an accounting from the Special Master of how much is owed by Mr. McCoy.  The Court

23  requests that the Special Master file a statement of how much Mr. McCoy owes by **January 4, 2010**.

24  Mr. McCoy may file a response by **January 19, 2010**.

25

26      **E.      Reserve for sanctions**

27      By Order dated March 19, 2009, this Court ordered Mr. McCoy to pay $25,000 in sanctions.

28  [Docket No. 1353]  Mr. McCoy has appealed that order, and it appears that the sanctions have not bee

1    paid.  Accordingly, $25,000 will be reserved to pay the sanctions when/if affirmed on appeal.

2

3    **V.    FedEx**

4         FedEx also filed a claim requesting that the Court retain the 10% of the full settlement value that

5    was interpled – $149,900 plus accrued interest – to account for the possibility that Ms. Parker might

6    prevail in her appeal of this Court's January 27, 2009 Order Granting FedEx's Motion for Declaratory

7    Relief (Docket No. 1279).  That order held that Ms. Parker was not entitled to seek statutory fees under

8    FEHA from FedEx for the work that she performed on behalf of the settlement plaintiffs.  FedEx argues

9    that if Ms. Parker prevails and FedEx is liable to Ms. Parker for statutory FEHA fees, FedEx would be

10   entitled to indemnification from the settlement plaintiffs pursuant to the terms of the settlement

11   agreements.

12        FedEx relies on several provisions in the settlement agreements.  First, FedEx notes that the

13   settlement plaintiffs waived their claims for attorneys' fees and costs from FedEx.   Settlement

14   Agreements ¶ 5 (Docket No. 980, Ex. 1-7).  Second, FedEx relies on the indemnification clause in the

15   settlement agreements, which provides a contractual right to indemnification by FedEx against the

16   settlement plaintiffs in the event that litigation continues: "If Releasing Party does file or institute, either

17   directly or indirectly, any lawsuit or proceeding of any kind against [FedEx] . . . Releasing Party agrees

18   to indemnify and hold [FedEx] harmless from damages or costs incurred by [FedEx] as a result of

19   [plaintiff's] actions, including any costs, expenses, and reasonable attorneys' fees incurred by [FedEx]."

20   *Id.* ¶ 21.

21        The Court finds that Ms. Parker is not a "Releasing Party" under the settlement agreements, and

22   thus regardless of the disposition of Ms. Parker's appeal, the settlement plaintiffs would not be obligated

23   to indemnify FedEx for the cost of defending against Ms. Parker's claims.  It is undisputed that the

24   settlement plaintiffs fired Ms. Parker before they entered into the settlements, and it is undisputed that

25   Ms. Parker was not a party to the settlement negotiations.  There is thus no basis for FedEx's argument

26   that "Releasing Party" includes Ms. Parker.  *See Crowley v. Maritime Corp. v. Boston Old Colony Ins.*

27   *Co.*, 158 Cal. App. 4th 1061, 1069 (2008), *citing E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294

28   (2002) ("It goes without saying that a contract cannot bind a nonparty."); 13 Williston on Contracts, §

United States District Court
For the Northern District of California

37.1 (4th ed.).  Furthermore, each settlement agreement contains a provision disclaiming knowledge of any existing claim for attorney's fees and costs "except those claims that have been filed with the Court by Kay Parker and Michael Cael Davis."  Docket No. 980, Ex. 1-7.  This disclaimer shows that the settling plaintiffs never intended, and were never empowered, to indemnify FedEx against Ms. Parker's claims for statutory or *quantum meruit* fees.

Accordingly, the Court DENIES FedEx's claim.

**CONCLUSION**

The Clerk shall disburse the interpled funds as follows:

1.  **To plaintiffs Kevin Neely, LaSonia Walker, Bertha Duenas, Alex Rivera, Janice Lewis, Dyronn Theodore** and **Tanda Brown**, the amounts set out in the separate Order Re: Disbursements to Plaintiffs, being filed under seal;

2.  **Angela Alioto:**  $20,285.16 (judgment lien) and accrued interest;

3.  **Carlene Young:**  $47,738 to Carlene Young (lien) and accrued interest;

4.  **Kay McKenzie Parker:**  $127,840.50 to Kay McKenzie Parker (fees minus payment to Dr. Young) and accrued interest;

5.  **Waukeen McCoy:**  $291,236.34 to Waukeen McCoy (fees minus payments to settlement plaintiffs, Ms. Alioto, Dr. Young, and amount reserved for Special Master's accounting) and accrued interest; and

6.  The Clerk shall retain $49,000 pending an accounting by the Special Master

///

34

The Court GRANTS Dr. Carlene Young's motion for release of funds. (Docket No. 1336). The Court GRANTS Angela Alioto's motion for release of funds. (Docket No. 1342). The Court DENIES Ms. Parker's administrative motion to strike defendant's sur-reply. (Docket No. 1397). The Court DISMISSES WITH PREJUDICE the claims of Kevin Neely, LaSonia Walker, Bertha Duenas, Alex Rivera, Janice Lewis, Dyronn Theodore, and Tanda Brown.

**IT IS SO ORDERED.**

Dated: December 18, 2009

_____
SUSAN ILLSTON
United States District Judge

United States District Court
For the Northern District of California

35