**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EDWARD ALVARADO, *et al.*,

        Plaintiffs,

  v.

FEDEX CORPORATION, dba FEDEX EXPRESS,

        Defendant.

_____/

No. C 04-0098 SI; No. C 04-0099 SI

**ORDER RE: ATTORNEYS' FEES PETITIONS FILED BY KAY PARKER McKENZIE AND WAUKEEN McCOY**

Now before the Court are (1) defendant's objections to the Special Master's Report and Recommendation on Kay Parker's Request for Attorney's Fees and Expenses (through August 31, 2008); (2) Parker's motion for "fees-on-fees" since August 31, 2008; and (3) Waukeen McCoy's motion for attorney's fees and costs.

**BACKGROUND**

In 2003, plaintiffs filed a class action against FedEx alleging claims of race discrimination in employment. *Satchell et al. v. FedEx Corporation et al.*, C 03-2659 SI. After FedEx filed a motion to sever certain individual plaintiffs from the class case, the parties stipulated that a number of plaintiffs would be severed from the class case and proceed in separate lawsuits on a non-class basis, and that any such cases would be deemed related to the class action. In 2004, sixteen plaintiffs filed these lawsuits against FedEx alleging various claims of employment discrimination against FedEx: *Alvarado et al. v. FedEx*, C 04-0098 SI and *White et al. v. FedEx*, C 04-0099 SI.

Attorneys Kay Parker and Waukeen McCoy were co-counsel, along with several other firms,

on the class case (*Satchell*).  In 2007, the parties reached a settlement in the class case, including a settlement of attorneys' fees.  McCoy was awarded $1,070,000.00 in fees, and Parker was awarded $358,182.19.  Docket No. 778 in C 03-2659 SI.

Parker and McCoy were also co-counsel in the individual actions.  In August 2005 and March 2006, the Court granted summary judgment in favor of FedEx on all claims alleged by plaintiffs John Azzam, Lore Paogofie, Christopher Wilkerson, Charles Gibbs, Maria Munoz, and Gary White. Docket Nos. 198, 366, 368 in 04-0098 SI and Docket No. 227 in 04-0099 SI.  The Court granted in part and denied in part defendant's motions for summary judgment as to the other ten plaintiffs.  *Id*. & Docket No. 367 in 04-0098 SI.[1]

### I.        Plaintiffs terminate Parker as counsel

The first sign of problems between attorneys McCoy and Parker surfaced on March 31, 2006. On that date, Parker filed a Notice of Attorney Lien for Fees and Costs.  Docket No. 375.  That document states, *inter alia*, that "by virtue of a written fee agreement between said plaintiffs and the undersigned attorney, she has a lien ahead of all others on plaintiffs' claims and causes of action, and on any settlement or judgment in favor of any plaintiff in this action, to secure payment for legal services rendered in an amount equal to forty percent (40%) of any recovery by plaintiff(s)."  *Id*.  On April 12, 2006, plaintiffs' former attorney Michael Davis filed a Notice of Attorneys' Fee Lien.  Docket No. 377.  On April 20, 2006, plaintiff Edward Alvarado filed a Notice of Substitution of Counsel for Plaintiff Edward Alvarado, stating that he wished to dismiss McCoy as his attorney and wanted to be represented solely by Parker.  Docket No. 380.

In response to Alvarado's filing, as well as several under seal filings by Parker and McCoy, on May 19, 2006, the Court issued an Order Re: Representation of Plaintiffs.  Docket No. 404.  That order stated,

> The Court has received conflicting submissions from plaintiffs and counsel regarding who is representing the remaining plaintiffs in this case.  Due to the confused state of the record, the Court hereby orders as follows: Docket Nos. 397, 398 and 400 (all filed under

_____

[1]  Unless otherwise stated, all further citations to the docket are citations to Case No. 04-0098 SI.

seal) are REMOVED from the file and shall be returned to Ms. Parker; docket Nos. 381-389 and 393 are REMOVED from the file and shall be returned to Mr. McCoy.

The Court further orders that by June 2, 2006, each individual plaintiff who remains in this action . . . shall file a statement with the Court regarding who they wish to represent them. . . .

*Id.* & Docket No. 405.

On June 1, 2006, each of the remaining plaintiffs, including Alvarado, filed a Notice of Termination of Attorney Kay McKenzie Parker. Docket Nos. 409-18. Each Notice was identically worded and stated,

I, a Plaintiff in the matter *Alvarado et al. v. FedEx*, hereby terminate Kay McKenzie Parker as my attorney of record in this matter. Ms. McKenzie Parker's business address is 703 Market Street, Suite 1401, San Francisco, Ca 94103. From this date forward, my only attorney of record in this case is Waukeen McCoy, and the Law Offices of Waukeen Q. McCoy at 703 Market St., Suite 1407, San Francisco, CA 94103. Please allow the court docket to reflect this fact.

Docket No. 409. On July 19, 2006, the Court signed orders granting plaintiffs' requests to terminate Parker as counsel. Docket Nos. 449-57 in 04-0098; Docket No. 247 in 04-0099.

## II.     Trial and settlement

After firing Parker, three plaintiffs (Edward Alvarado, Pernell Evans, and Charlotte Boswell) proceeded to separate jury trials, represented by McCoy and his office. All three plaintiffs prevailed at trial: in September 2006, a jury awarded Alvarado $500,000 on his retaliation claim; in November 2006, a jury awarded Evans $950,000 on his claims of retaliation and discrimination; and in April 2007, a jury awarded Boswell $3 million on her claims for sexual harassment, retaliation, and constructive discharge.     In post-trial orders filed on March 18, 2008, the Court remitted Alvarado's damages to $300,000; granted judgment as a matter of law in favor of FedEx and against Evans; and applied the Title VII $300,000 cap to Boswell's punitive damages award, thus reducing her total damages to $850,000. Docket Nos. 1035-37.

On appeal, the Ninth Circuit affirmed this Court's decision with regard to Alvarado. Docket No. 1554. The Ninth Circuit affirmed in part and reversed in part with regard to Boswell, and remanded

United States District Court
For the Northern District of California

3

United States District Court
For the Northern District of California

Boswell's case for a new trial on punitive damages only.[2]  Docket No. 1556.

In November 2007, the seven remaining plaintiffs reached settlements with FedEx ("settlement plaintiffs").[3]  McCoy and his office represented the plaintiffs in the settlement negotiations.  All of the settlement plaintiffs signed identical settlement agreements, save for the amount of the settlement, and each agreement defined "Releasing Party" as the plaintiff and "[HIS or HER] heirs, successors, administrators, agents or representatives, and attorneys in this matter . . . ."  Settlement Agreement ¶ 2, Douglas Decl., Docket No. 980, Ex. 1-7.  The settlement agreements released all claims for attorneys' fees, including any claims by Parker for her fees and costs:

> . . . Releasing Party knowingly, willingly, and voluntarily releases and waives all rights to, and claims for monetary relief or individual equitable relief for HIMSELF . . . against Released Parties regarding any aspect of HIS employment with FedEx Express, the subsequent ending of that employment, and any other events occurring prior to, and including, the effective date of this Agreement . . . These rights and claims for monetary relief or individual equitable relief include, but are not limited to . . . any or all rights or claims for monetary relief or individual equitable relief under any federal, state, or local statutes, or under common law, *including any claims for attorneys' fees and/or costs*.

Settlement Agreement ¶ 5 (emphasis added).  Paragraph 8 of the settlement agreements provided that "each party will bear its own costs, including attorney's fees, arising from this action."  *Id.* ¶ 8.  Paragraph 18 of the settlement agreements states "Releasing Party warrants and represents that HE is fully entitled to give this complete release and discharge, and that HE is fully aware of all facts and rights to HIS claims."  *Id.* ¶ 18.  Paragraph 21 of the settlement agreements provided a contractual right to indemnification by FedEx against the settlement plaintiffs in the event that litigation continues:

> Releasing Party agrees never to institute, directly or indirectly, any proceeding of any kind against Released Parties based on, arising out of, or as a consequence of Releasing Party's employment with FedEx Express or the termination of that employment.  If Releasing Party does file or institute, either directly or indirectly, any lawsuit or proceeding of any kind against Released Parties on account of any matters which can be waived by law and over which HE has waived HIS rights in this Agreement, Releasing Party agrees to indemnify and hold Released Parties harmless from damages or costs incurred by Released Parties as a result of HIS actions, including any costs, expenses,

---

[2]  Evans, still represented by McCoy, filed an untimely notice of appeal.  The Court denied Evans' motion to file a late appeal, finding that McCoy's declaration in support of that motion was made in bad faith.  In a memorandum decision, the Ninth Circuit vacated and remanded for reconsideration in light of *Lemoge v. United States*, 587 F.3d 1188 (9th Cir. 2009).  Docket No. 1555.  On remand, the Court granted Evans permission to file a late appeal.  That appeal is pending.

[3]  The seven "settlement plaintiffs" are Tanda Brown, LaSonia Walker, Kevin Neely, Dyronn Theodore, Alex Rivera, Janice Lewis, and Bertha Duenas.

1   and reasonable attorneys' fees incurred by Released Parties.  Thus, based on this
2   provision, should the Court decline to award declaratory relief, FedEx will have the right
    to sue the Settlement Plaintiffs for indemnification.

3   *Id.* ¶ 21.  The settlement agreements were signed by the settling plaintiffs and McCoy.  Under McCoy's

4   signature each agreement states:

5       I, Waukeen Q. McCoy, of the Law Offices of Waukeen Q. McCoy, do hereby
        acknowledge full and complete satisfaction of any claim for attorneys' fees and costs
6       regarding this matter and certify that to my knowledge no other attorney or firm or other
        entity has a claim for attorneys' fees and costs in this matter except those claims that
7       have been filed with the Court by Kay Parker and Michael Cael Davis.

8   *Id.* at 7.  McCoy then separately executed this statement.

9

10  **III.    Fee proceedings related to settlement plaintiffs**

11          After finalizing the settlements with the settlement plaintiffs, FedEx filed a motion for

12  counterclaim and interpleader relief.  Docket No. 955.  FedEx sought to interplead 40% of the settlement

13  funds to protect itself against multiple claims from various people who filed liens in this case.  Parker

14  filed a "conditional acceptance" of the interpleader, stating that she did not waive her right to seek fees

15  directly from FedEx.  Docket No. 958.  Lienholder Carlene Young (an expert retained by plaintiffs) and

16  lienholder Michael Davis (a former attorney for plaintiffs) filed statements of non-opposition to the

17  interpleader.  Docket Nos. 969 & 998.  Plaintiffs filed a response to FedEx's interpleader motion, stating

18  that "Plaintiffs do not oppose the interpleader of the amount in controversy: 40% of the settlement funds

19  . . . [and] the remaining 60% is uncontested and should be immediately disbursed to the order of

20  Plaintiffs."  Docket No. 974 at 2.

21          On December 14, 2007, the Court held a hearing on defendant's motion.  In response to

22  argument by Parker's counsel (Mr. Rosen) that the Court should interplead 100% of the settlement funds

23  because of the possibility that, *inter alia*, McCoy had secret "side agreements" with the settlement

24  plaintiffs regarding the allocation of settlement monies, the Court engaged in the following colloquy

25  with McCoy:

26      The Court:    All right.  My question to you is, do you – will you receive any money from the
                     Plaintiffs from their 60 percent, as you have put it, of the proceeds here?
27
        Mr. McCoy:   No.
28

5

| | | |
|---|---|---|
| The Court: | Anything?  A dime, a penny? |
| Mr. McCoy: | No.  Absolutely not. |
| The Court: | Would you be willing to put a declaration to that effect? |
| Mr. McCoy: | I would be willing to put a declaration to that effect, Your Honor. |
| The Court: | How many Plaintiffs are there?  Seven? |
| Mr. McCoy: | There's seven. |
| The Court: | And could I get a declaration from each of them as well? |
| Mr. McCoy: | Sure. |
| The Court: or | That they're not going to give that money back to you for any purpose, to pay costs, or for any reason at all? |
| Mr. McCoy: | I can do that, Your Honor. |
| The Court: | Would that satisfy at least that one issue, in your mind? |
| Mr. Rosen: | Yes, Your Honor. |
| The Court: | Okay.  If you do that, Mr. McCoy, that will help me a lot in deciding the pending motion. |
| Mr. McCoy: | Okay.  Sure.  I'll do that, Your Honor.  I'll get declarations from all the clients, saying that they have no side agreements with me to pay me anything besides what's in my contact, which is the 40 percent of attorneys' fees. |

Docket No. 995 at 22:13-23:16.

After the December 14, 2007 hearing, McCoy and the seven settlement plaintiffs filed sworn declarations stating that the settlement plaintiffs would each receive a full 60% of their respective settlement amounts and were not paying any additional money beyond a maximum of 40% of the settlement amount to McCoy for attorneys' fees or costs.  Docket Nos. 984 (Janice Lewis, Bertha Duenas, and Kevin Neely); 987 (Tanda Brown, Lasonia Walker); 989 (Dyronn Theodore); 1002 (Alex Rivera).  McCoy also filed a declaration stating:

I, WAUKEEN McCOY, declare and certify as follows:

. . .

3.   My fee agreements with the Plaintiffs in this matter requires the client to pay the costs incurred in bringing this case.

4.   In order to facilitate the speedy payment of sums due to Plaintiffs under those fee

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

agreements and their settlement agreements with FedEx, I agreed to waive my rights to costs from the Plaintiffs who settled their cases with FedEx herein.

5.    As a result, each of my clients who have settled their cases will be paid the full 60% of their settlement in this matter with no subtraction or withholding of costs, fees, or any other sum however denominated.

6.    I have not entered into any other agreement of any kind with any person, including any and all attorneys, concerning the proceeds of my clients' settlement in this matter.

7.    I am aware of no other agreements which would impact the receipt of my clients of the full 60% of their settlement amounts.

8.    I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Docket No. 983.

On February 4, 2008 the Court granted defendant's motion in part; interpled 50% of the settlement funds ($749,500.00)[4]; and ordered the Clerk to disburse the remaining 50% of the settlement proceeds directly to the settling plaintiffs, on a pro rata basis. Docket No. 1008. On February 14, 2008, the Court amended the order to join Angela Alioto, a judgment-creditor of McCoy, as an additional lienholder. Docket No. 1018. On May 2, 2008, plaintiffs entered into a stipulation with one lienholder, Michael Davis, to disburse $48,000 from the interpled funds to Davis. Docket No. 1099.

Parker then wished to seek statutory FEHA fees from FedEx for her work on behalf of the seven settlement plaintiffs. Parker contended that she was not bound by the settlement agreements' release of attorneys' fees and costs because neither the plaintiffs nor McCoy represented her interests in the settlement negotiations, and the parties excluded her from the settlement process. Parker also contended that she had the right to seek fees directly from FedEx under FEHA, and she relied on the Special Master's order (and this Court's adoption of that order) finding that Parker has standing under FEHA to seek fees directly from FedEx for the work she performed on behalf of the judgment plaintiffs.[5]   In response, FedEx filed a motion for declaratory relief seeking an order that Parker had no right to fees from FedEx. Docket No. 1163. In an order filed January 27, 2009, the Court granted FedEx's motion

---

[4]   The Court interpled 50% of the funds because at that time it was unclear whether the lienholders' claims might exceed 40% of the funds.

[5]   This order is discussed *infra* in connection with the judgment plaintiffs.

for declaratory relief.  The Court held that Parker could not seek statutory fees under FEHA from FedEx with regard to the seven settlement plaintiffs, and that to the extent she is entitled to fees, she must seek them from her former clients under quantum meruit, based on *Fracasse v. Ray Raka Brent*, 6 Cal. 3d 784 (1972).  Docket No. 1279 at 5-7.[6]

On February 4, 2009, plaintiffs – through McCoy as a "cross-defendant" – filed a motion to dismiss the interpleader and immediately release the remaining funds to the seven settlement plaintiffs and McCoy.  Docket No. 1290.  Prior to the February 25, 2009 hearing, plaintiff Kevin Neely sent a letter to the Court.  Docket No. 1313.  That letter requested that the Court not release the remaining interpled funds to McCoy's trust account, claimed that McCoy had taken $15,000 each from the settlements of Tanda Brown, LaSonia Walker and Bertha Duenas, and accused McCoy of trying to extort extra money from the clients.[7]

FedEx and the lienholders opposed McCoy's motion to dismiss the interpleader.  By order filed February 25, 2009, the Court denied McCoy's motion and set a schedule for resolving all issues related to the interpled funds.  Docket No. 1314.  That order directed all parties and lienholders with an interest in the interpled funds to file their claims, with supporting documentation, by March 13, 2009.

Lienholders Dr. Carlene Young and Angela Alioto filed timely motions for release of funds (Docket Nos. 1336 & 1342), and Parker filed a timely claim and declarations in support of her claim.  FedEx also filed a claim to the interpleader, requesting that the Court set aside a portion of the interpled funds on the ground that Parker's appeal of this Court's order holding that she cannot seek statutory FEHA fees from FedEx related to the settlement plaintiffs implicated the settlement agreements'

---

[6] In a memorandum disposition filed May 26, 2011, the Ninth Circuit affirmed this Court's order holding that Parker could not seek statutory fees for her work on behalf of the settlement plaintiffs. Docket No. 1737 (9th Cir. Appeal Nos. 09-15415 and 09-15417).

[7] Several weeks earlier, on February 2, 2009, the Court had received a letter from "clients" that was addressed to the undersigned judge, and copied to counsel for FedEx and Parker.  Docket No. 1294. That letter also claimed that McCoy had Brown, Duenas, and Walker deliver him cash money from their settlement proceeds.  At the February 25, 2009 hearing, McCoy stated that he was "looking into a claim of defamation against whoever wrote the first ['client'] letter, which is not signed by anybody, and then the second letter [Neely's February 25, 2009 letter] because they're false and they're silly."  February 25, 2009 Transcript at 12:18-22 (Docket No. 1323).  At the April 23, 2009 evidentiary hearing, Neely testified that he wrote the February 25, 2009 letter.  All of the plaintiffs stated that they did not write the "client" letter.

United States District Court

For the Northern District of California

indemnification provision.

McCoy did not file a claim by March 13, 2009, and instead filed a notice of appeal of the February 25, 2009 order. Docket No. 1317. McCoy also filed a "response" to the interpleader claims, as well as motions contending that the appeal divested this Court of jurisdiction over the interpled funds and requesting that the Court stay all proceedings related to the interpled funds until the Ninth Circuit resolved the appeal. Docket No. 1374. By order filed April 17, 2009, the Court found that the appeal did not divest this Court of jurisdiction, and denied McCoy's motion for a stay. Docket No. 1383. The order also noted that McCoy had not filed a claim to the interpled funds, and that in the absence of a claim filed by McCoy, it would be very difficult for the Court to determine McCoy's entitlement to any of those monies. The order stated that if McCoy wished to file a claim for payment of attorneys' fees related to the settlement plaintiffs, he needed to file a claim and any supporting documentation by April 21, 2009. *Id.* On April 21, 2009, attorney Jonathan Bass entered an appearance as counsel for McCoy in the interpleader proceedings. Docket No. 1385. On April 21, 2009, McCoy filed a claim to the interpled funds. Docket No. 1393. On April 22, 2009, the Ninth Circuit dismissed McCoy's appeal for lack of jurisdiction. Docket No. 1399, Ex. A.

On April 23, 2009, the Court held an evidentiary hearing. Present were Mr. Bass appearing for McCoy, Parker and her counsel, Dr. Carlene Young and her counsel, counsel for FedEx, counsel for Angela Alioto, six of the settlement plaintiffs (Tanda Brown, Kevin Neely, Bertha Duenas, LaSonia Walker, Janice Lewis, and Dyronn Theodore), and plaintiffs Pernell Evans and Charlotte Boswell. McCoy did not attend the hearing.

At the hearing, the settlement plaintiffs were sworn in and provided the following testimony in response to questioning from the Court about whether they paid McCoy any money.[8] Brown testified,

MS. BROWN:        When we – when Mr. McCoy distributed the [settlement]

_____

[8] In response to questioning from FedEx's counsel about whether McCoy still represented the settlement plaintiffs, the settlement plaintiffs present at the hearing stated that "we all are still in agreement with McCoy under the assumption that – well, he is still our lawyer, but I think that we all agree that perhaps we didn't want him to be our lawyer, but because we were here, we didn't want any further liens on any monies that we might have coming to us. So, we continued to keep him as our lawyer instead of starting over or getting another lawyer." Docket No. 1442, Ex. A at 54:13-21; *see also id.* at 54:21-56-19.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

|     |     |     |
| --- | --- | --- |
| 1   |     | checks,[9] he called me to his office to actually give him my check from Federal Express. I wasn't present for the December 2007 hearing in regards to the declaration. The way the declaration was explained to me was that he was pretty much doing us a favor in agreeing to the declaration. And as a result of that, he would trust us to pay him fees that would – was owed to him in order for the monies to be released through the Court. So, when the check was actually in his office, he asked me to come over, and he instructed me to open up an account with Bank of America so the monies would be released faster. I asked him if he could receive a cashier's check in lieu of the cash, and he said no, it needed to be cash. When I went to Bank of America, they – I guess this was an unusual request, so they kind of hesitated with that. I called Mr. McCoy back on the phone and asked him again if it did need to be in fact, in cash, and he said it did, a cashier's check wouldn't do. That took a couple of days. And I went back to Bank of America, I don't remember the exact dates, it was in March. |

|     |     |     |
| --- | --- | --- |
| THE COURT: | March of what year? |
| MS. BROWN: | 2008 . . . Actually, I have a copy of the check that I wrote to Bank of America here, and the money was released on March 3rd, 2008. And Mr. McCoy met me at Bank of America with the cash because I was uncomfortable walking down the street with that much money, and I gave him the cash. |
| THE COURT: | And is that a copy of – |
| MS. BROWN: | This is a copy of the check that was – that I wrote on my account to release the cash with Bank of America. |
| THE COURT: | To release the $15,000? |
| MS. BROWN: | That's correct. |
| . . . | |
| THE COURT: | So start again about the B of A account. The settlement check was available for you and made out to you, and then what happened? |
| MS. BROWN: | And Mr. McCoy suggested that I open up a B of A account because the check itself was drawn on a B of A account. And he let me know, then, that the monies would be released faster if I would open up an account. I had never had a B of A account up to that point, so that's what I did in order for the money to be released so he could receive his money fast. |
| THE COURT: | And then do you recall what day it was that you met Mr. McCoy |

---

[9] When the settlement checks were originally disbursed, each check was made out solely in the name of each settlement plaintiff – per the direction of the Court – and the checks were sent to McCoy's office for distribution.

United States District Court
For the Northern District of California

| | | |
|---|---|---|
| 1 | | and gave him the $15,000? |
| 2 | MS. BROWN: | The day of that check. |
| 3 | THE COURT: | March 3rd. |
| 4 | MS. BROWN: | Yes, March 3rd. |
| 5 | THE COURT: | Okay.  And what – did he tell you what the money was for? |
| 6 | MS. BROWN: | Fees. |
| 7 | THE COURT: | Fees, okay. |
| 8 | MS. BROWN: | Yes. |

9  Docket No. 1442, Ex. A at 8:4-10:16; Docket No. 1402 (copy of Brown's check dated March 3, 2008,

10  made out to Tanda Brown in the amount of $15,500; receipt from Bank of America dated March 3, 2008

11  for $15,000).

12      Next, Walker testified.

| | | |
|---|---|---|
| 13 14 | THE COURT: | I basically have the same questions for you, ma'am, as I did for Ms. Brown. |
| 15 16 17 18 19 | MS. WALKER: | Well, like Tanda said, that we were informed of the monies that we – that we were awarded, and we were to come to his office to pick the check up.  And he told me specifically that we needed to pay him fees, he gave me an amount of $17,000, and that I needed to pay it in cash.  And my question was why, why do we have to pay him in cash?  He said because he did us a favor by – he said that he waived his fees to the Court and that he would not be getting those fees and that we were to pay him cash.  At the time, I gave him – I gave him the cash and I inquired about the other plaintiffs. |
| 20 21 | THE COURT: | Well, how, when you say at that time you gave him the cash, what did you do, mechanically? |
| 22 23 24 25 | MS. WALKER: | Okay.  I went to – I had an account with B of A already.  I went to B of A and tried to see if I can get my – the check cashed and take the $15,000 out.  They told me they couldn't do that, I had to give them notice.  So then, I went to – it was a newly-opened account, not that day.  So, I went to my previous credit union to see if they could release the funds that day, they couldn't do it that day, either.  So I had to come back that next day.  They said to give them 24-hour notice.  So I came back that next day, and– |
| 26 | THE COURT: | To the credit union? |
| 27 28 | MS. WALKER: | To the credit union.  To the credit union.  And that is where they released the cash to me the next day. |

| | | |
|---|---|---|
| 1 | THE COURT: | So you got $17,000? |
| 2 | MS. WALKER: | He told me I owed 17.  No, Your Honor, he said I owed 17, but that I could give him the 15 that day, and then when we got the prior money that I could finish paying him. |
| 3 | | |
| 4 | THE COURT: | So you got $15,000 in cash from your credit union. |
| 5 | MS. WALKER: | Absolutely. |
| 6 | THE COURT: | From money that you previously had in the bank? |
| 7 | MS. WALKER: | No, from the checks.  But they had to hold it for 24 hours. |
| 8 | THE COURT: | Yes.  And then, how did you get the cash to him? |
| 9 | MS. WALKER: | I came back over here and got the cash and walked into his office. |
| 10 | THE COURT: | Was it the credit union – |
| 11 | MS. WALKER: | Patelco Credit Union on Second Street, or something. |
| 12 | THE COURT: | So, you got the cash from them and then walked it over to his office? |
| 13 | | |
| 14 | MS. WALKER: | Got the cash from the credit union, walked it over to his office, and gave it to him in an envelope. |
| 15 | THE COURT: | And that was what day, ma'am, do you remember? |
| 16 | MS. WALKER: | On or about February 10th, or something like that. |
| 17 | THE COURT: | Of '08? |
| 18 | MS. WALKER: | Of '08, yes.  My statement is saying the 8th, but that could just have been the day that check cleared. |
| 19 | | |
| 20 | THE COURT: | Do you have any papers with you today? |
| 21 | MS. WALKER: | Yes, ma'am. . . . I have the statement here, Your Honor, yes, ma'am. |
| 22 | THE COURT: | So show me where the $15,000 is. |
| 23 | MS. WALKER: | 4/8 withdrawal, 4/08.  Mine should say Patelco Credit Union. |
| 24 | THE COURT: | I see a $10,000 entry. |
| 25 | MS. WALKER: | And then, there is a five right underneath that, Your Honor. |
| 26 | THE COURT: | That looks like $500. |
| 27 | MS. WALKER: | Yes, five and then the ten – I'm sorry.  Exactly, exactly.  I'm sorry, Your Honor, ten, five, that's right. |
| 28 | | |

**United States District Court**
For the Northern District of California

| | | |
|---|---|---|
| 1 | THE COURT: | So it was $10,500. |
| 2 | MS. WALKER: | Yes, Your Honor. I'm sorry. I'm sorry. It was a lot of cash. |
| 3 | THE COURT: | Did he give you a receipt of any kind? |
| 4 | MS. WALKER: | No, ma'am he did not. |
| 5 | THE COURT: | Ms. Brown, did he give you a receipt of any kind? |
| 6 | MS. BROWN: | (Shaking head.) |

Docket No. 1442, Ex. A at 13:22-17:9; Docket No. 1402 (Walker's April 2008 Patelco statement showing a $10,000 withdrawal on April 10, 2008 and a $500 withdrawal on April 11, 2008).

Duenas also testified:

| | | |
|---|---|---|
| THE COURT: | I have the same questions for you, ma'am: Did you wind up giving cash money to Mr. – |
| MS. DUENAS: | Yes, I did. I gave him $15,000 cash in February. |
| THE COURT: | And what – how did that happen? What happened? |
| MS. DUENAS: | After we got paid from Federal Express, I got two checks, one for 20 – no, $15,000-plus and one for $100,000. Waukeen asked me to give him some fees of $15,000. So what I did, I went to the – my Wells Fargo and deposited the $15,000 check plus. And I had to wait about ten days to withdraw the cash because he requested it right away, but I had to wait at least ten days for the check to clear. And I withdraw the check – I mean, the cash, and I came and drop it off. And I met him on Market. And I believe the place was McDonald's, right on the corner. And I gave him – I mean, I gave him $15,000 cash. And here is a copy of the withdrawal. . . That was withdrawn on February 26. |
| . . . | |
| THE COURT: | Oh, okay, thanks. So now I'm with all of you on this. So I see that there is – you deposited $100,000, 5 – |
| MS. DUENAS: | Right, that's one of the checks. |
| THE COURT: | And then you withdrew the $15,000. |
| MS. DUENAS: | Correct. |
| THE COURT: | And that withdrawal, it looks like it was made on March 24th; is that right? |
| MS. DUENAS: | Looks like – it says 26th. It was right after they gave us the check on deposit, and there was, like, ten days later. |
| THE COURT: | Okay, so you went into the bank to do the withdrawal – |

13

United States District Court
For the Northern District of California

| | | |
|---|---|---|
| 1 | MS. DUENAS: | Correct. |
| 2 | THE COURT: | And they gave you the money. |
| 3 | MS. DUENAS: | Correct. |
| 4 | THE COURT: | And then, that same day, did you meet Mr. McCoy at McDonald's? |
| 6 | MS. DUENAS: | Yes, I did.  I took BART, and I met him on Market Street.  I believe it was McDonald's, the restaurant, and went inside.  I met him there and went to his car and gave him the envelope with the cash. |
| 8 | THE COURT: | Did he give you a receipt? |
| 9 | MS. DUENAS: | No, he did not. |

Docket No. 1442, Ex. A at 17:19-19:12; Docket No. 1402 (Duenas' Wells Fargo Bank statement for Feb. 27 - Mar. 25, 2008 showing $15,000 withdrawal on Mar. 24, 2008).  Plaintiff Kevin Neely testified that although McCoy did not ask Neely to pay him any money out of the settlement proceeds, McCoy did inform Neely that litigation costs would be deducted.  Neely testified that when McCoy mailed him the settlement check, McCoy also enclosed a letter stating,

Dear Mr. Neely,

Attached, please find payments reflecting the settlement of the above-captioned matter with FedEx.  The expenses of litigation which you owe pursuant to contract was [sic] not taken out of the amounts provided to you pursuant to the Court's order dated Feb. 4, 2008.  At the release of the remaining funds costs will be deducted.

Congratulations.

Docket No. 1401 (letter dated Feb. 20, 2008 from McCoy to Neely).  Neely testified,

MR. NEELY:    When I questioned Mr. McCoy's actions, fees that I felt like he was not entitled to, especially after he signed a declaration stating he wouldn't take any more money from us, he then sent another letter, approximately 15, 20 days later, stating that he would be entitled to my full 60 percent and that he would ask the Court to relieve him of his waiver so he can pursue other means.

Docket No. 1442, Ex. A at 60:4-10.  That letter, which Neely submitted at the hearing, states,

Dear Mr. Neely,

This letter serves to memorialize the voicemail that I left with you today, clarifying the letter that was written on February 20, 2008.  As you know I waived all costs and you are entitled to the full 60% of your settlement funds pursuant to Court Order.  However, I am going to request to the Court, after all settlement funds are disbursed and it is proved that all of the liens are invalid, that the Court would relieve me of my waiver.

14

As you know, you do not have to support me in that request. In you have any questions or concerns please feel free to contact me at your earliest convenience.

Docket No. 1401 (letter dated Mar. 5, 2008 from McCoy to Neely).

Another plaintiff, Dyronn Theodore, also testified that the day he went to pick up his settlement check from McCoy's office, McCoy asked him for a payment.

| | |
|---|---|
| THE COURT: | Okay, so Mr. Theodore, you can tell me anything you want, but I'm particularly concerned whether Mr. McCoy requested cash from you after you received your settlement. |
| MR. THEODORE: | Yes, he requested cash of me, but I told him I didn't have it, and that I was giving my mother half of my money, and I couldn't afford to give him anything. |
| THE COURT: | Was it – was it orally or was it in the letter, or how did he ask you? |
| MR. THEODORE: | No, I just told him. |
| THE COURT: | How did he ask you? |
| MR. THEODORE: | He told me whatever I can give him to give him, but I told him I couldn't afford to give him anything. |
| THE COURT: | Did he ask you for a specific number? |
| MR. THEODORE: | No. No, ma'am. He was just like, whatever you can afford. |

. . .

| | |
|---|---|
| THE COURT: | And when did this happen? |
| MR. THEODORE: | The day that I went to pick up my – the monies. |
| THE COURT: | Uh-huh. |
| MR. THEODORE: | The day that I went there, he was just like, whatever you can afford to give him. And, I was, like, I don't have anything because I already made an agreement with my mother whatever ever I was getting that I was going to give her half of whatever I got. And then he said something about, like, if I were to get some more money coming back he will call me and let me know, or something like that, but, no call, no nothing. |

Docket No. 1442, Ex. A at 60:18-61:23.

Lewis also testified that McCoy asked her to pay him money from her settlement proceeds.

| | |
|---|---|
| THE COURT: | And Ms. Lewis? |
| MS. LEWIS: | Yes, he did. The day that I went to go pick up my check, Waukeen told me that I owed him $17,000, and that he would |

United States District Court
For the Northern District of California

1    want that money then.  And, before he would issue the check to
     me, he gave me this letter.  And I'll go get it.[10]

2

3    THE COURT:          Okay.

4    MS. LEWIS:          And then he came back and said we had a misunderstanding,
                         that's not what I said.  But I clearly heard exactly what he said,
                         that I owed him $17,000, and he would like that money.

5

6    THE COURT:          And what did you say to that?

7    MS. LEWIS:          I don't have $17,000.  How am I going to give you $17,000?

*Id.* at 61:25-62:13; *see also* Docket No. 1401 (Mar. 5, 2008 letter from McCoy to Lewis, stating that

McCoy would be seeking the Court to relieve him of his waiver of costs after all settlement monies were

disbursed).

        Several plaintiffs testified that, separately from the money they paid McCoy from the settlement

checks, they had paid McCoy various amounts for "fees" over the years.  Duenas testified and submitted

evidence in the form of a bank statement and receipts showing that she made three payments: a $1,000

check on January 5, 2006,[11] a $197.00 credit card payment on August 21, 2007, and $1,350.00 credit

card payment on August 21, 2007.  Docket No. 1402.  Brown testified that she made payments of

approximately "over a couple thousand dollars" to McCoy over the years, but that she did not bring any

documentation of the payments with her to Court.  Docket No. 1442, Ex. A at 22:15-19.  Similarly,

Walker testified that "he [McCoy] charged fees for everyone, but some of us weren't able to pay.  I think

along the way, I may have given him about $1,500."  *Id.* at 23:8-11.  Walker also did not have any

documentation of these payments.  All three women testified that McCoy did not provide receipts for

any of these payments.  *Id.* at 21:21-13; 23:13-19.  Neely testified that he had paid McCoy

approximately $7,000 over the years.  *Id.* at 59:5-9.  After the hearing, Neely filed a letter with

documentation of some of these payments, which occurred in 2002 and 2005.  Docket No. 1418.

        Bass, appearing for McCoy, questioned Brown, Duenas and Walker about their understanding,

---

[10]   The letter is dated February 20, 2008, and the text is identical to the wording of McCoy's
February 20, 2008 letter to Neely.  Docket No. 1401.

[11]   The testimony about the date of this payment was somewhat confused; however, Duenas'
bank statement for 12/11/05-1/10/06 shows a "Check to Waukeen McCoy" for $1,000 with a transaction
date of January 5, 2006.

United States District Court
For the Northern District of California

if any, of the distinction between "fees" and "costs," and whether they understood that under the retainer agreement, the plaintiffs were responsible for "costs." Docket No. 1442, Ex. A at 24:2-27:16. Bass did not question plaintiffs about their testimony about the payments they made to McCoy out of their settlement proceeds, or about McCoy's requests for payment out of the settlement proceeds.[12]

After the hearing, the parties filed supplemental briefs, and the briefing was completed on June 15, 2009. McCoy filed supplemental papers and declarations responding to Parker's papers, but he did not file anything in response to the testimony of the plaintiffs at the evidentiary hearing. In addition, several of the plaintiffs filed letters. Docket Nos. 1417, 1418, 1470, 1472, & 1478. Neely's letters (Docket Nos. 1417, 1418, and 1472) provided documentation of payments to McCoy in 2002 and 2005, inquired about the status of the interpleader proceedings, and requested that the Court award plaintiffs McCoy's attorneys' fees. Rivera, who did not attend the April 23, 2009 hearing, sent a letter (Docket No. 1470) stating that Parker did not have a contract with plaintiffs, that Parker did not do any work for plaintiffs, defending McCoy, and accusing this Court of holding the interpled funds as "ransom in an effort to get me to say something negative about my attorney, Waukeen McCoy." *Id.* Brown's letter (Docket No. 1478) enclosed copies of the Notice of Termination of Parker, and states that Brown and other plaintiffs have not interacted with Parker since September 2005, and states her "firm belief" that Parker was not involved with the "settlement cases."[13]

In an order filed December 18, 2009, the Court ruled on the parties' motions regarding the interpled funds and the settlement plaintiffs. Docket No. 1499. That order held, *inter alia*:

> Here, Ms. Parker claims that she is entitled to a *quantum meruit* fee of the entire sum that remains for attorneys' fees ($551,600, excluding interest), and a majority of the funds from the additional interpled funds to pay for $126,314.86 in costs. Ms. Parker has submitted declarations and evidence showing that from the inception of these cases until June 2006, she was heavily involved in the litigation. Ms. Parker conducted or defended 20 of the 33 depositions between December 2004 and August 2005, including taking the depositions of top level FedEx managers and defending the depositions of settlement plaintiffs Dyronn Theodore and LaSonia Walker. Ms. Parker also claims that Mr. McCoy was absent from this case and unavailable, conducting trials in unrelated

---

[12] The testimony of these settlement plaintiffs was uncontradicted, and was unchallenged by McCoy. The Court found each of the witnesses to be credible and forthright, and finds that the facts, as they testified to them, are true.

[13] Neely and Brown mailed their letters directly to the Court. Rivera's letter was filed by McCoy.

cases, for most of the entire heavy litigation period in 2005. Mr. McCoy contends that he and his office performed the vast majority of the work for the settlement plaintiffs, and that Ms. Parker's work was directed primarily at the plaintiffs who lost on summary judgment.

The Court has presided over this contentious litigation from the beginning, and is very familiar with the work performed by both Ms. Parker and Mr. McCoy. The Court finds as a factual matter that for significant periods of time when these cases were being heavily litigated, Ms. Parker bore the brunt of the litigation on behalf of plaintiffs. The Court also finds that a considerable amount of Ms. Parker's work – such as taking the depositions of FedEx managers and preparing and defending expert depositions – was performed on behalf of the settlement plaintiffs. However, the Court finds that Ms. Parker's lodestar is not a proper measure of the value of her work up until the time of her termination. As the docket reflects, many of the plaintiffs' claims did not survive summary judgment, and this reflects, to a large degree, the quality of Ms. Parker's work. *See, e.g.*, Docket No. 133 in 04-0099 (Ms. Parker's opposition to FedEx's motion for summary judgment as to plaintiffs White and Rivera). Second, the Court firmly believes that it is unlikely the settlements would have been reached if not for the fact that plaintiffs Alvarado, Boswell and Evans – represented by Mr. McCoy – prevailed at trial, each with significant jury verdicts. Although the Court has found that Mr. McCoy engaged in serious misconduct in these cases, the Court also finds that it was Mr. McCoy's success at trial in the Alvarado, Boswell and Evans cases that almost certainly provided the impetus for settlement. As a result, the Court concludes that Mr. McCoy should be awarded 75% of the contingency fees ($413,700 before deductions), and Ms. Parker should receive 25%, $137,900 for her fees and costs. This ratio is the most equitable division of attorneys' fees that compensates the attorneys for the value of the work they performed for the settlement plaintiffs. In the Court's view, this division both recognizes the fact that Ms. Parker kept these cases going during periods of intense litigation, and also that the settlements are largely due to the efforts of Mr. McCoy in trying and prevailing in the Alvarado, Evans and Boswell cases.

Docket No. 1499 at 27:21-29:5. The Court awarded Parker $137,900 in attorneys' fees and costs, and McCoy $413,700 in fees.[14] That money was disbursed in January 2010, and both Parker and McCoy appealed that order.

In a memorandum disposition filed June 3, 2011, the Ninth Circuit affirmed in part, reversed in part, and remanded. Docket No. 1738 (9th Cir. Appeal Nos. 10-15057 and 10-15137). The Ninth Circuit held, *inter alia*, that (1) this Court did not err in dividing the attorneys' fees between McCoy and Parker and that Parker was entitled to recover in *quantum meruit*; (2) this Court did not abuse its discretion in awarding Parker 25% of the contingent fee and McCoy the remaining 75%; (3) this Court did not abuse its discretion denying Parker's claims for contract labor and establishing a new residence and office in San Francisco, and similarly did not abuse its discretion in holding that establishing a new

---

[14] The Court ordered that the payments made by Brown, Duenas and Walker to McCoy out of their settlement proceeds were to be deducted from McCoy's fees and returned to the plaintiffs.

1   office and residence was an "overhead" expense and not "travel"; and (4) this Court abused its

2   discretion by finding that certain other costs incurred by Parker were recoverable, yet including them

3   in Parker's award of contingency attorneys' fees without explanation.  The Ninth Circuit remanded for

4   further proceedings regarding Parker's costs.

**United States District Court**
For the Northern District of California

6   **IV.    Fee proceedings related to Alvarado and Boswell (statutory fees)**

7       After plaintiffs Alvarado, Evans and Boswell prevailed at trial, both Parker and McCoy filed

8   motions for attorneys' fees under FEHA.  *See* Docket No. 715 (McCoy's initial fee petition for

9   Alvarado, filed March 13, 2007); Docket No. 741 (Parker's initial fee petition for Alvarado, filed March

10  30, 2007); Docket No. 839 (Parker's initial fee petition for Boswell, filed June 4, 2007); Docket No. 842

11  (McCoy's initial fee petition for Boswell, filed June 4, 2007).  In response to McCoy's fee petitions,

12  FedEx filed motions for sanctions against McCoy, contending that McCoy's fee petitions were replete

13  with misrepresentations.  Docket Nos. 817 and 885.  In response, McCoy sought sanctions against

14  FedEx for "unreasonably multiplying proceedings."  Docket No. 821.  Those matters were referred to

15  the Special Master, Edward Swanson, for decision in the first instance.[15]

17      **A.    Parker's fee petitions**

18      The parties first litigated the question of whether Parker's fee petition for Alvarado was

19  untimely, with both FedEx and McCoy (at that time still representing plaintiffs) contending that the fee

20  petition was late.  In an order filed June 15, 2007, the Special Master held that Parker's fee petition for

21  Alvarado was untimely.  Parker filed a motion for reconsideration, and obtained new counsel to

22  represent her on the fee petition.  Through her new counsel, Rosen Bien & Galvan ("RBG"), Parker

23  raised a new argument regarding the timeliness of her Alvarado fee petition.  The parties also litigated

24  the question of whether Parker had standing to seek statutory fees for work that she performed for the

26      [15] After the Special Master began conducting proceedings related to McCoy's fee petition and
    FedEx's motion for sanctions against McCoy, McCoy moved to disqualify the Special Master (Docket
27  No. 940); that motion was denied.  Docket No. 988.  McCoy filed a petition for a writ of mandamus with
    the Ninth Circuit; that petition was denied.  Docket No. 1021.  McCoy also moved to revoke the orders
28  of reference to the Special Master.  Docket No. 1299.  That motion was also denied.  Docket No. 1354.

judgment plaintiffs prior to her termination.  *See generally* Docket No. 1062 (Special Master's April 7, 2008 Order, setting forth procedural history).  In the fee proceedings before the Special Master, Parker submitted "an exemplar of the form agreement that was signed by all Plaintiffs."  Docket No. 932, Ex. A.[16]  The form agreement states, *inter alia*, "We have agreed to the following attorney fee arrangement . . . 40% of any amounts received or recovered by way of settlement after arbitration, mediation or trial." *Id*. at 1.  The agreement also states that "You hereby grant us a lien on any and all claims, causes of action, judgments or settlements that are the subject of my representation under this agreement.  Our lien will be for any sums due and owing to me at the conclusion of our services.  The lien will attach to any recovery you may obtain, whether arbitration award, judgment, settlement or otherwise." *Id*. at 2.

In an April 7, 2008 order, the Special Master found that Parker's Alvarado fee petition was not untimely.  The Special Master also found that the fee agreements did not address the issue of statutory fees after a trial, and instead "on their face, the contracts appear to address only what the attorneys will receive 'by way of settlement.'" Docket No. 1062 at 11.  The Special Master held that Parker had standing under FEHA to seek her reasonable attorneys' fees and costs on behalf of the judgment plaintiffs, and that she had standing to seek those fees and costs directly from FedEx. *Id*. at 14.  The Special Master found that "none of the agreements between [the judgment] plaintiffs and counsel have the effect of assigning statutory fees to the clients or of assigning them to McCoy at the exclusion of Parker, and that the existence of a contract also does not deprive Parker of standing.  Pursuant to *Flannery* [*v. Prentice*, 26 Cal. 4th 572 (2001)] and *Lindelli* [*v. Town of San Anselmo*, 139 Cal. App. 4th 1499 (2006)], Parker has standing to seek fees in *Alvarado* and *Boswell*." *Id*. at 14-15.  The Special Master also found that Parker did not have standing to seek statutory fees from FedEx under a *quantum meruit* theory. *Id*. at 17.  This Court adopted these findings in an order filed June 5, 2008.  Docket No. 1145.

On July 2, 2008, the Special Master issued an order permitting Parker and McCoy to file amended fee records in connection with the fee motions pending before him.  Docket No. 1176.  In an

---

[16]  The fee agreements are discussed in greater detail *infra*.

1    order filed August 8, 2008, this Court denied FedEx's objection to the Special Master's order.  Docket

2    No. 1197.

3           On September 19, 2008, Parker filed an amended and supplemental fee petition.  Docket Nos.

4    1217-1222.  FedEx opposed the amended and supplemental fee petition, and also filed a motion for

5    sanctions against Parker.  The Special Master received extensive briefing and held a number of hearings

6    on these matters.  On October 12, 2010, the Special Master issued two separate Reports and

7    Recommendations.  In a 15 page Report and Recommendation, the Special Master recommended

8    denying FedEx's motion for sanctions.  Docket No. 1618.  In a 51 page Report and Recommendation,

9    the Special Master recommended granting Parker's amended fee petition, subject to a number of specific

10   deductions, as well as several across-the-board deductions.  Docket No. 1619.

11          FedEx objected to the Special Master's Reports and Recommendations on numerous grounds.

12   On February 4, 2011, this Court held a hearing on FedEx's objections.  FedEx argued, *inter alia*, that

13   the Court could not determine a reasonable fee until the Court had before it (1) Parker's request for

14   "fees-on-fees" for the period September 1, 2008 to the present,[17] and (2) McCoy's (third)[18] fee petition

15   (discussed *infra*).  This Court agreed with FedEx that it was necessary to assess the two fee petitions

16   together because both attorneys are seeking to recover for work performed on behalf of the same clients,

17   and in an order filed February 4, 2011, the Court directed Parker to file a supplemental fees-on-fees

18   petition.  Docket No. 1681.  In that same order, this Court denied FedEx's objection to the Special

19   Master's Report and Recommendation Re: FedEx's Motion for Sanctions.  *Id*.[19]  On March 3, 2011,

20   Parker filed her supplemental fees-on-fees petition.  Docket Nos. 1701-1705.

21   ─────────────

22          [17]  Parker's amended fee petition included fees-on-fees through August 31, 2008.

23          [18]  FedEx refers to this as McCoy's third fee petition because McCoy filed his initial petitions
     in March 2007, and then an amended petition in September 2008 while the fee matters were pending
     before the Special Master and before this Court struck McCoy's fee petitions in March 2009.

24

25          [19] FedEx's motion for sanctions had requested that the Court deny Parker's amended fee petition
     in its entirety on the grounds that the documentation supporting her petition is fraudulent and because
26   the hours claimed are excessive.  In denying FedEx's motion for sanctions, the Court agreed with the
     Special Master's detailed findings that sanctions are not appropriate because there is no evidence that
27   Parker falsified her time records.  Docket No. 1681 at 2:5-7.  The February 4, 2011 order also stated,
     "[t]he Court agrees with the Special Master that while Parker's petition may be inflated in various
     respects, the inflation does not support imposition of the extreme sanction that FedEx seeks, and can
28   be appropriately addressed by reducing Parker's fee award."  *Id*. at 2:7-9.

United States District Court
For the Northern District of California

**B.      McCoy's fee petitions**

On May 22, 2008, the Special Master issued a Report and Recommendation on FedEx's motion for sanctions against McCoy, and on McCoy's motion for sanctions against FedEx. Docket No. 1137. The Special Master recommended that Court impose sanctions against McCoy, in the amount of $25,000, based on his finding that McCoy engaged in bad faith with regard to the original fee petitions filed in March 2007. Both parties objected to that Report and Recommendation. On March 19, 2009, this Court issued an order adopting and modifying the Special Master's Report and Recommendation. In a lengthy opinion, this Court found that McCoy engaged in serious misconduct with regard to his fee petitions, and that McCoy repeatedly misrepresented both to the Special Master and this Court that his fee petitions were based on contemporaneous time records, when in fact they were not. The Court found that McCoy's misconduct was so egregious that it warranted the extreme sanction, sought by FedEx, of striking the fee petitions entirely. *See generally* Docket No. 1353.

In a memorandum decision filed June 22, 2010, the Ninth Circuit affirmed in part and reversed in part. Docket No. 1553 (9th Cir. Appeal No. 09-15575). The Ninth Circuit affirmed the initial denial of McCoy's fee petitions, but held that the Court erred in imposing sanctions without providing McCoy due process. The Ninth Circuit also stated,

> Ordinarily, an attorney should be allowed to refile a fee request after errors have been corrected. But in appropriate circumstances a district court may deny permission to refile. For example, a district court may, in its discretion, deny permission to refile when it is evident from prior failures to correct errors that the fee applicant has been either unable or unwilling to correct those errors. The district court is free, on remand, to determine whether a denial of permission to refile may be justified on this basis rather than justified as a sanction. If justified on this basis, the procedural protections applicable to sanctions would of course not apply.
>
> We note that in deciding whether to deny McCoy permission to refile a request for attorney's fees, the district court may wish to consider the possible effect of such a denial on McCoy's clients. It is possible that if McCoy is unable to collect statutory attorney's fees from FedEx he may be able to collect contractual attorney's fees from the clients. In that event, it would be the clients rather than McCoy who would suffer the adverse consequences of McCoy's misconduct in seeking fees.

*Id*. at 5-6.

On remand, McCoy sought leave to file amended fee petitions. In an order filed February 4, 2011, the Court granted McCoy's motion. Docket No. 1681. The Order stated that "[t]he Court expects that McCoy and his counsel will take all steps necessary to ensure that the amended fee petition is

22

United States District Court
For the Northern District of California

accurate and properly documented.  The Court is mindful of the issues raised by FedEx in opposition to McCoy's motion for leave.  However, the Court finds that denying McCoy leave to file an amended fee petition would both adversely and unfairly affect his former clients, and would result in an inequitable windfall to FedEx."  *Id*. at 1:18-22.

On March 4, 2011, McCoy (through his fee counsel) filed an amended fee petition.  On May 27, 2011, the Court held a hearing on McCoy's amended fee petition and on Parker's updated fee petition.

## C.  Interpleader of Alvarado and Boswell jury awards

On June 22, 2010, the Ninth Circuit issued decisions affirming this Court's post-trial order in Alvarado's case, and affirming in part and reversing in part this Court's post-trial order in Boswell's case. Docket Nos. 1554, 1556.  After the mandates issued, FedEx sought to interplead the entire amount of Alvarado's jury award (plus accumulated interest), and the entire amount of Boswell's compensatory damages award (plus accumulated interest).  In an orders filed October 12, 2010 and February 4, 2011, the Court granted FedEx's motions.  Docket No. 1617, 1681.

The Court directed the Clerk to disburse 50% of the interpled amounts directly to Alvarado and Boswell, and the Court retained the remaining 50% in the Court's registry pending resolution of the attorneys' fees matters. The Court noted that Parker had filed a separate motion seeking a determination that in the event her statutory fee motion was denied, she would be permitted to seek fees from her former clients on a *quantum meruit* theory.  McCoy opposed the interpleaders, and asserted that the reserved funds should be disbursed to him as contingency fees.[20]  In the February 4, 2011 order, the

---

[20] As the docket reflects, at various times McCoy has taken the position that all of the plaintiffs owe him a full 40% contingency fee, notwithstanding (1) claims by Parker and other individuals to the interpled funds at issue and (2) McCoy's claim for statutory fees under FEHA.  At the same time that McCoy filed numerous motions to dismiss the *Alvarado* interpleader, McCoy was also litigating the question of whether he should be permitted to file an amended statutory fee petition.

At the May 27, 2011 hearing, this Court asked McCoy's fee counsel whether McCoy believed he was entitled to both statutory and contingent contract fees.  McCoy's counsel replied that he was not sure, since the issue has not been "joined," and that he was not prepared to bind his client with his view on the question.  After conferring with McCoy, he then stated as follows:

[O]ur position is that Mr. McCoy's clients, Boswell and Alvarado, should be entitled to a dollar-for-dollar reduction in their exposure or obligation to pay a contingent fee, with

23

1    Court denied those motions:

2        As the record reflects, the disputes over attorneys' fees and costs have been protracted
         and complicated, and there are competing claims to the interpled funds: Boswell and
3        Alvarado assert that neither McCoy nor Parker is entitled to contingent or *quantum
         meruit* fees; Parker seeks costs that she advanced, as well as the right to seek in *quantum
4        meruit* if her statutory fee is denied; and McCoy asserts that he is entitled to both a
         contingent fee and a statutory fee.   Until the Court issues a final order regarding
5        McCoy's and Parker's fee awards, the Court cannot make a determination about whether
         plaintiffs must pay any contingent or *quantum meruit* fees to their former attorneys.
6
7    Docket No. 1681 at 3:12-20.

8

9

10                                    **DISCUSSION**

11   **I.    Parker's amended fee petition (statutory fees)**

12        **A.    Merits fees**

13        Parker's amended fee petition requested a lodestar of $1,425,769.50 of merits fees, representing

14   3001.62 hours of work at $475/hour.[21]    Parker also sought a multiplier of 2.0, for a total of

15   $2,851,539.00 in merits fees.

16        The Special Master issued a 51 page Report and Recommendation regarding Parker's amended

17   fee petition.  Docket No. 1619.  The Special Master made a number of specific deductions to Parker's

18   fee petition.  The Special Master also recommended a 10% across-the-board reduction to remedy the

19   "overage" that resulted from Parker billing in quarter-hour increments, *id*. at 8:9-11, and a 20% across-

20   the-board reduction "to offset the apparently systematic inflation of hours."  *Id*. at 32:20.  The Special

21   Master stated that both of these across-the-board reductions were "conservative."  *Id*. at 8:11, 32:25-27.

22        the following gloss or caveat; that the dollars that should be offset are the net dollars that
         flow to Mr. McCoy as a result of the award.  And that would need to take into account
23       the cost to him of getting there.

24       That is to say: If, for example, he receives an award that hypothetically is precisely 40
         percent of the ultimate recoveries, in the aggregate, from Boswell and Alvarado, but it
25       costs him a third of that to achieve that recovery, the offset should be the two thirds that
         flow to him, in our view.
26
     Docket No. 1740 at 9:7-20.
27
         [21]  The Court finds that Parker's rate (and her higher 2010 rate applied for the fees-on-fees time,
28   discussed *infra*), is supported.

United States District Court
For the Northern District of California

In total, the Special Master recommended reducing Parker's lodestar to $751,124.15, and awarding a multiplier of 1.75, for a total of $1,314,467.26.

FedEx filed objections to the Special Master's Report and Recommendation; Parker did not. FedEx asserts that "[w]hat Parker seeks in fees for two plaintiffs for cases she did not take to trial, is exorbitant, unreasonable, and not supported by credible documentation."  Docket No. 1637 at 1:5-6. FedEx contends that Parker's fee application is systematically inflated, and FedEx argues that the Court should either deny Parker any fees, or make further, substantial reductions and award no multiplier.  In response, Parker asserts that the Court should adopt the Special Master's Report and Recommendation. Parker contends that a fee award of $2,851,539.00 is reasonable compensation (fees-on-fees are addressed *infra*) for her work.

The Court has carefully reviewed the record in this case and finds that while Parker is entitled to a statutory fee award, over $2.8 million in merits fees is not reasonable.  It bears repeating that Alvarado and Boswell fired Parker in June 2006, and Parker did not represent either plaintiff at trial. While Parker and McCoy dispute which of them (or their offices) performed particular tasks on behalf of plaintiffs, it is undisputed that McCoy, and not Parker, represented plaintiffs after the July 19, 2006 Orders re: Termination of Counsel were filed, and that McCoy successfully represented plaintiffs at trial and on post-trial motions.

The Special Master recommended a "conservative" 30% across-the-board reduction in Parker's lodestar to address systematic inflation.  The Court finds that a greater across-the-board reduction is warranted.  The California Supreme Court has held that "[a] fee request that appears unreasonably inflated is a special circumstance permitting the trial court to reduce the award or deny one altogether." *Serrano v. Unruh (Serrano IV)*, 32 Cal.3d 621, 635 (1982); *Abouab v. City & County of San Francisco*, 141 Cal. App. 4th 643, 674 (2006).  In addition, the Ninth Circuit has held that "when faced with a massive fee application the district court has the authority to make across-the-board percentage cuts either in the number of hours claimed or in the final lodestar figure as a practical means of trimming the fat from a fee application."  *Gates v. Deukmejian*, 987 F.2d 1392, 1399 (9th Cir. 1992) (internal quotation marks omitted).

United States District Court
For the Northern District of California

**1.       20% across the board reduction for billing in quarter-hour increments**

The Special Master found that 93% of Parker's entries were in quarter-hour increments, and that Parker's use of this billing practice overstated the number of hours actually worked.  Docket No. 1619 at 7:3-15.  The Special Master conservatively recommended a 10% across-the-board reduction to account for this practice.  The Court finds it appropriate to impose a 20% across-the-board reduction to compensate for this overbilling.  *See Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 948-49 (9th Cir. 2007) (district court has authority to impose across-the-board reduction for block billing, provided the court explains why reduction "fairly balances" hours billed in block format); The State Bar of California Committee on Mandatory Fee Arbitration, Arbitration Advisory 03-01 (2003) (estimating that billing in increments of .25 to .5 "probably increases the time by 15% to 25%").[22]  Because almost all of Parker's entries were in quarter-hour increments, a 20% across-the-board reduction is appropriate.

**2.       40% across-the-board reduction for pervasive inflation**

The Special Master also imposed a "conservative" 20% across-the-board reduction in Parker's lodestar to address pervasive inflation in her fee petition.  The Special Master found considerable evidence of inflation throughout Parker's fee petition, and made detailed findings in support of his recommendation to impose a 20% across-the-board reduction to address that inflation.  Specifically, the Special Master found (1) a number of large block bills seeking compensation for periods ranging from 10 to 40 hours in a single entry, Docket No. 1619 at 10-11; (2) repeated billing for excessively long days of 18 hours or more, including one entry for 22.85 hours in a single day and one entry for 23.85 hours in a single day, *id*. at 21-22[23]; (3) repeated billing of excessive time for faxing or emailing documents

---

[22]http://www.calbar.ca.gov/Attorneys/MemberServices/FeeArbitration/ArbitrationAdvisories.aspx.

[23] Before the Special Master, Parker argued that these charges were reasonable because she was not seeking payment for all hours worked.  For example, for the entry where she claimed she worked 23.85 hours on April 21, 2005, Parker sought payment for 7 hours.  The Special Master found that "entries showing Parker billed for an implausible amount of time cast doubt on the reliability of her records regardless of how much payment she requests for that work.  For example, Parker's claim that she worked more than 23 hours in a single day is not credible, whether or not she seeks compensation

to McCoy to deliver to the Court (such as recording 1.5 hours to "fax to Waukeen and John pltf's ex parte application to amend CMC schedule" and 1.0 hour to "overnight mail package to WQM's office for delivery to Judge Illston -- chambers copies," *id*. at 23-24); (4) repeated billing of excessive amounts for e-filing documents, and also billing excessive time for drafting the documents (such as billing 1.25 hours for e-filing a three page case management conference statement after having already spent 9.5 hours drafting it, *id*. at 20:12-21, 24-25); and (5) numerous inflated entries, such as spending 1.5 hours to prepare a three-sentence letter and billing 1.5 hours to review a 19-line letter about deposition scheduling, *id*. at 26-31. The Special Master stated that the numerous specific examples of inflated time entries detailed in his Report were "not intend[ed] to be an exhaustive list." *Id*. at 31:8-9.

The Court finds it appropriate to impose an 40% reduction (instead of the 20% "conservative" reduction recommended by the Special Master) across-the-board to address what appears to be significant and pervasive inflation in Parker's fee petition. This Court agrees with the Special Master's assessment that Parker's fee petition suffers from considerable padding, and the Court adopts and incorporates all of the Special Master's findings. The Court recognizes, as did the Special Master, that on occasion even seemingly simple tasks can take a long time. However, the Court cannot accept Parker's representation that every one of the very many simple tasks identified in the Special Master's Report took as long as Parker claims. As just one example highlighted by the Special Master, Parker claimed that it took her three hours to review the letters from plaintiffs that terminated her representation. Each letter was one paragraph long, and the letters were identical. As the Special Master noted, "That means Parker is claiming she read one notice, which could have taken only minutes, then read the other eight, identical notices, which could have taken only minutes, but somehow spent three full hours on the task. To put it charitably, this is not credible." *Id*. at 30:20-24. Parker's fee petition is replete with these types of entries.[24]

---

for all 23 hours." Docket No. 1619 at 22:14-19. The Court agrees.

[24] As another example, the Special Master raised questions about the following two large block bills from January and February 2006:

• 10 hours for "meeting-docs. Prep-pltfs' trial docs. Review and commence witness lists/voir dire questions for Janice Lewis, LaSonia Walker, Dyronn Theodore and Exhibit

### 3.     Travel

The Court also deducts **$103,550.00** from Parker's lodestar (218 hours at $475/hour) for travel time spent driving between San Francisco and Fresno.  Although paying clients routinely pay for occasional travel time for out of town depositions, settlement conferences, or court hearings, here the "travel" at issue is more properly characterized as a lengthy (4.5 hours each way) commute that should be absorbed into Parker's overhead.

### 4.     Depositions

FedEx contends that Parker should not recover for time spent on depositions that were not directly related to Alvarado or Boswell's cases.  FedEx has prepared a chart titled "Time Billed By Parker for Unnecessary Depositions" showing a total of 166.5 hours.  Docket No. 1637, App. 5.  The chart contains time spent on depositions of various FedEx managers who did not supervise Alvarado or Boswell.  The Court finds that the time spent on those depositions is recoverable at 60% because the depositions of FedEx managers and HR personnel, even if those individuals were not directly involved in the Alvarado and Boswell cases, were necessary to developing the common factual background of these cases.  Accordingly, the Court deducts 40% of this time, for a deduction of **$31,635** (166.5 hours at $475/hour = $79,087.50; $79,087.50 x .4 = $31,635).

### 5.     Multiplier

Parker's amended fee petition sought at 2.0 multiplier, and the Special Master recommended a

---

Lists for Ed Alvarado, Alex Rivera, Gary White (5+hours per day)" between January 25 and January 26, 2006
- 10 hours for "telephone conferences with WQM and staff re status of my trial prep docs" between February 10 and February 17, 2006

Docket No. 1619 at 10:10-13.  As the Special Master noted, both of these bills relate to trial preparation, and yet on January 4, 2006, the Court vacated the trial date finding it "likely that the Court's orders on the summary judgment motions will substantially narrow the issues to be decided at trial."  Docket No. 355 at 1:19-20.  The Special Master wrote, "Despite that order, Parker claims to have continued trial preparation for clients as to whom no trial date had been set and who she did not know would go to trial (and all but one of whom ultimately did not proceed to trial).  While it is unlikely an attorney would engage in intensive trial preparation under these circumstances, it must be acknowledged that it is not impossible."  Docket No. 1619 at 10:16-21.

1.75 multiplier based on contingent risk, complexity of the case, and preclusion of other employment. The Special Master also found,

> Parker's pretrial termination presents a more difficult question. Parker asserts that Alvarado and Boswell's success was "due in large part to [her] years of hard work on their behalf." Reply, 23. The special master, who was not present at trial, is unable to judge the extent to which the jury awards were the product of Parker's pretrial work, and FedEx has offered no evidence in opposition to Parker's claim. Nonetheless, the special master assumes Alvarado and Boswell's victories owed at least as much to McCoy's trial representation as to Parker's preparatory work. Moreover, the fact that Parker did not represent plaintiffs at trial reduces the risk she faced based on the contingent nature of the award, as she invested less time and fewer resources in the cases than she would have had she been trial counsel. The special master concludes that the fact plaintiffs prevailed at trial without Parker's presence militates against the 2.0 multiplier.

Docket No. 1619 at 47:9-19.

The Court has considerable discretion in determining whether to apply a multiplier. "[T]he awarding of attorney fees and the calculation of attorney fee enhancements are highly fact specific matters best left to the discretion of the trial court." *Graham v. DaimlerChrysler Corp.*, 34 Cal.4th 553, 581 (2004); *see also Center for Biological Diversity v. County of San Bernadino*, 185 Cal. App. 4th 866, 901 (2010) ("There is no hard-and-fast rule limiting the factors that may justify an exercise of judicial discretion to increase or decrease a lodestar calculation. There are numerous such factors, and their evaluation is entrusted to a trial court's sound discretion; any one of those factors may be responsible for enhancing or reducing the lodestar.") (internal citation and quotations omitted). Under California law, the Court has discretion to adjust the lodestar based on factors including "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award." *Ketchum v. Moses*, 24 Cal.4th 1122, 1132 (2001) (citing *Serrano v. Priest*, 20 Cal.3d 25, 49 (1977)). "[T]he party seeking a fee enhancement bears the burden of proof." *Ketchum*, 24 Cal. 4th at 1138.

Based upon a careful review of the record in this case, as well as the Court's experience presiding over this litigation since its inception, the Court finds that Parker is not entitled to a multiplier. The Court recognizes, as the Special Master did, that this case presented contingent risk and that Parker's work on this case precluded other employment. However, all other factors weigh in favor of

no upward adjustment of the lodestar.  With regard to the complexity of the case, the Special Master found, and the Court agrees, that these cases were not as complex as some civil rights matters; Alvarado's jury trial on his claims of discrimination and retaliation lasted six days, and Boswell's jury trial on her claims of sexual harassment, retaliation, and constructive discharge lasted seven days. Moreover, as the Special Master found, Parker's work did not encompass the trials, thus reducing the complexity of her task.  Further, as the Court found in connection with Parker's *quantum meruit* fee award in connection with the settlement plaintiffs, while Parker bore the laboring oar of much of the pretrial litigation, her work was often unsuccessful.  *See* Docket No. 1499 at 27:21-29:5 (*quantum meruit* fee order); *see e.g.*, Docket No. 133 in 04-0099  (Parker's opposition to FedEx's motion for summary judgment as to plaintiffs White and Rivera).

In addition, the Special Master assumed, because he was not present at trial, that Alvarado and Boswell's victories owed at least as much to McCoy's trial preparation as to Parker's pretrial work.  The Court reaches a different conclusion.  The Court presided over both trials, and it is the Court's opinion that Alvarado and Boswell's victories at trial were primarily attributable to McCoy's trial preparation and Alvarado and Boswell's exceptional demeanor as witnesses.  As the Court found in denying FedEx's post-trial motions, both plaintiffs were articulate, came across as forthright, and their testimony was persuasive.  *See* Docket Nos. 1035 at 4:16-22 (Alvarado); 1037 at 7:22-27 (Boswell).  It is also the Court's observation that a number of the FedEx witnesses struggled in their trial testimony, and that likely contributed to plaintiffs' success at trial.

Finally, "the trial court need not consider a multiplier when presented with an inflated, unreasonable fee request."  *Christian Research Inst. v. Alnor*, 165 Cal. App. 4th 1315, 1329 (2008).

United States District Court
For the Northern District of California

### 6.    Summary of merits fees

| | |
|---|---|
| Lodestar sought in amended fee petitions: | $1,425,769.50 |
| Lodestar after discrete deductions by Special Master: | $1,073,034.50[25] |
| Travel deduction: | -  $103,550.00 |
| Partial deposition deduction: | -    $31,635.00 |
| Lodestar after travel and deposition deductions: | $937,849.50 |
| 60% reduction for billing increments and billing inflation: | -  $562,709.70 |
| Adjusted lodestar | **$375,139.80** |

The Court finds that given the circumstances of this case, an adjusted lodestar of $375,139.80 is eminently reasonable.  The Court is also awarding McCoy a statutory merits fee award of $997,673.00, for a total attorney fee award of $1,372,812.40.  Parker asserts that her fee claim should "not be linked" with McCoy's fee claim, and that "[a]ny award of FEHA fees to Mr. McCoy will not affect the amount of Ms. Parker's entitlement to recover her reasonable attorney's fees and costs from FedEx."  Docket No. 1654 at 36:17-18.  The Court has not "linked" the two fee petitions, and the Court has evaluated Parker's (and McCoy's) fee petitions on their own merits.  At the same time, because Parker and McCoy are seeking fees for their work performed on behalf of the same clients in the same cases, the Court does find it appropriate that the total fee award for both attorneys be reasonable.

### B.    Expenses

After making a number of deductions, the Special Master recommended awarding Parker $145,009.63 in expenses.  FedEx contends that the Court should make a number of additional deductions for the cost of the Alvarado trial transcript, expert witness fees, court reporter fees paid by Parker's fee counsel, Special Master fees, and 30% of the pre-contingency payment to fee counsel.

The Court finds that, with the exception of certain expert witness fees, these expenses are all recoverable and were necessarily expended in the course of the underlying merits litigation or the fees litigation.  Parker seeks the following costs: $52,558.31 for experts Stephenson/MacPherson, and $5,351.67 for Pratt.  FedEx objects that Parker has not actually paid these costs, to which Parker

---

[25]  This figure is found at Docket No. 1619, Appendix of Recommended Deductions to Parker Lodestar and Expenses, at 3.

responds, "Ms. Parker incurred these costs, and they are properly awardable against FedEx.  It is immaterial whether she paid them to the experts before filing her fee petition, or awaited payment from FedEx to do so."  Docket No. 1654 at 38:26-27.  Thus, Parker does not dispute that she has not yet paid the expert fees.

McCoy is also seeking costs for Stephenson, and states that he has already paid those expenses.  Docket No. 1731 ¶ 41 & Ex. D (copies of checks written to Litigation Economics LLC or Stephenson).  McCoy has submitted checks and other documents totaling $50,000.  While the Court agrees in principle with Parker that she can recover expert fees that she has not yet actually paid, so long as she pays those fees after receiving a statutory award, FedEx is not responsible for the same expert fees twice.  As such, the Court reduces Parker's expenses by $50,000, and directs Parker to pay the remaining $2,558.31 to Stephenson/MacPherson once Parker receives her monies.  Accordingly, the Court awards **$95,009.63** in costs to Parker.

### C.      Fees-on-fees

#### 1.      RBG's lodestar

Before the Special Master, Parker's fee counsel ("RBG") sought a "fees-on-fees" lodestar of $405,378 for work through August 31, 2008.   The Special Master recommended a number of discrete deductions, resulting in a lodestar of $388,260 for work through August 31, 2008.  Parker and RBG do not contest the deductions made by the Special Master.  As discussed *supra*, the Court directed RBG to supplement the fee application with all time claimed after August 31, 2008.  RBG's supplemental fee application seeks an additional $917,135.11 for work performed after August 31, 2008,[26] for a total fees-on-fees lodestar of $1,305,395.11.  RBG seeks a 1.25 multiplier for the fee work, discussed *infra*, for a total award of $1,631,743.89 (not including expenses).

RBG contends that their lodestar is reasonable and appropriate because of the complexity of the fee litigation.  RBG asserts that the reasonableness of its fee request is demonstrated by, *inter alia*, the facts that RBG made "billing judgment" deductions to its fees-on-fees lodestar totaling 1,039.53 hours;

---

[26]  This figure is taken from the Appendix of Docket No. 1727.

United States District Court

For the Northern District of California

made further deductions "in an abundance of caution to account for any possible overlap of work"; and took an additional 10% across-the-board reduction from its time. Docket No. 1727 at 5:6-27.

The Court agrees that this fee litigation has been complex and difficult – unnecessarily so. The Court concurs with the Special Master's assessment that,

> In addition to contesting Parker's standing to seek any fees at all, FedEx has aggressively sought extensive discovery from Parker, has resisted her efforts to obtain discovery, has moved to sanction her, and has challenged almost every dollar she claims. In short, FedEx has fought Parker's fees request at every turn.

Docket No. 1619 at 37:2-5. However, Parker and her fee counsel are not without fault with regard to the complexity of this fee litigation. Parker sought and was granted leave to file amended fee petitions because, in Parker's own words, she "previously inaccurately estimated the time I spent representing Plaintiffs Alvarado, Boswell, and Evans . . . ." Docket No. 1218 ¶ 30. Although Parker and RBG criticize FedEx (with some justification) for FedEx's aggressive defense of the fee litigation, it is noteworthy that Parker's original fee petitions sought a lodestar of $348,721.80 for Alvarado (Docket No. 733-1) and a lodestar of $401,512.50 for Boswell (Docket No. 839), for a total of $750,234.30. Parker's amended fee petitions, in contrast, sought a lodestar of $1,425,769.50, more than twice the original combined lodestar. Under those circumstances, particularly in light of the fact that Parker did not represent either plaintiff at trial, it is not surprising that a defendant would vigorously oppose the fee petitions.[27]

The Ninth Circuit has held that "a district court does not abuse its discretion by applying the same percentage of merits fees ultimately recovered to determine the proper amount of the fees-on-fees award." *Schwarz v. Sec'y of Health & Human Servs.*, 73 F.3d 895, 909 (9th Cir. 1995) (surveying cases and holding that district court "was well within its discretion in awarding 50% of the fees-on-fees requested because this ratio actually exceeded the percentage by which Schwarz prevailed on her request for merits fees"); *accord Thompson v. Gomez*, 45 F.3d 1365, 1368 (because plaintiffs received 87.2% of the merits fees they sought, court properly awarded 87.2% of plaintiffs' requested fees-on-fees); *Harris v. McCarthy*, 790 F.2d 753, 759 (9th Cir. 1986); (same, but percentage was

---

[27] The Court does not condone, however, the raising of meritless objections or scorched-earth tactics.

United States District Court
For the Northern District of California

11.5%). "[B]oth *Harris* and *Thompson* confirm that a district court can apply a percentage formula to reduce the fees-on-fees requested without providing an additional explanation for its actions, since it already has provided a 'concise but clear explanation of its reasons for the [merits] fee award' and that same explanation underlies and supports the decision to award fee-on-fees in the same (or, as here, about the same) percentage." *Schwarz*, 73 F.3d at 909 (brackets in original, no citation in original).

For all of the reasons discussed *supra*, the Court finds that this is an appropriate method for calculating Parker's fees-on-fees.[28] Parker's merits recovery is 27% of the amount she originally sought in her amended fee petition (Parker sought $1,425,769.50 not including a multiplier; the Court is awarding an adjusted lodestar of $375,139.80). Accordingly, the Court awards RBG **$357,078.54** in fees-on-fees, which is 27% of the total amount originally sought before the Special Master and this Court, $1,322,513.11.

### 2. Parker's fees-on-fees lodestar

Parker seeks 70 hours of her own time spent on the post-August 31, 2008 fees-on-fee petition, for a total of $36,750. Parker and RBG assert that Parker's assistance was necessary due to her superior knowledge of the file and record. Parker and RBG also assert that her claim is for "the bare minimum of non-duplicative time constituting a minor fraction of the time she committed to the work." Docket No. 1727 at 11:12-14.

The Court finds it appropriate to award Parker fees-on-fees for her own work, albeit at 27 percent of the amount sought. Accordingly, the Court awards Parker **$9,922.50** in fees-on-fees.

### 3. Multiplier

RBG seeks a 1.75 multiplier. For all of the reasons stated above with regard to why Parker is not entitled to a multiplier, and why Parker and RBG are entitled to 27% of the lodestars sought, the Court exercises its discretion and finds that RBG is not entitled to a multiplier.

---

[28] The Special Master declined to adopt this approach when reviewing RBG's fees-on-fees request through August 31, 2008. However, the partial fees-on-fees petition presented to the Special Master sought significantly less than the combined total sought in the supplemental fees-on-fees petition submitted to this Court.

United States District Court
For the Northern District of California

34

United States District Court
For the Northern District of California

### 4.     Fees-on-fees expenses

RBG seek $55,802.29 in expenses incurred from September 1, 2008 through May 6, 2011. Docket No. 1727 at 12:22-24.  The expenses are for copying, online research, postage and delivery, "toll telephone charges," special master fees, travel/mileage/parking, and court reporter fees.  Docket No. 1728, Ex. G.  The Court finds that these are all recoverable expenses, with the exception of "toll telephone charges" ($200.16) which is properly considered overhead.  Accordingly, the Court awards **$55,602.13**.

### 5.     Summary of fees-on-fees

| | |
|---|---|
| Lodestar sought in amended fee petitions: | $ 1,322,513.11 |
| 73% reduction: | -  $965,434.57 |
| Adjusted lodestar | **$357,078.54** |

## D.     Post-judgment interest

Parker asserts that post-judgment interest should accrue on the entire fees award commencing with June 5, 2008, the date on which Parker's entitlement to fees was fixed.  *See* Docket No. 1145 (June 5, 2008 order holding Parker had standing to seek statutory fees for Alvarado and Boswell cases).  Parker cites *Friend v. Kolodzieczak*, 72 F.3d 1386 (9th Cir. 1995), and *Finkelstein v. Bergna*, 804 F. Supp. 1235 (N.D. Cal. 1992), which both hold that plaintiffs are entitled to post-judgment interest on fee and cost awards "from the date that entitlement to fees is secured, rather than from the date the exact quantity of fees is set."  *Friend*, 72 F.3d at 1391-92; *Finkelstein*, 804 F. Supp. at 1239-40.  FedEx does not dispute this point in their papers.  Parker also states, and FedEx does not dispute, that the applicable rate of interest on June 5, 2008 was 2.19 percent.  *See* 28 U.S.C. § 1961.

Accordingly, the Court awards post-judgment interest at the rate of 2.19 percent on Parker's fee and cost award, beginning June 5, 2008.

**II.    McCoy's amended fee petition (statutory fees)**

**A.    Merits fees**

McCoy's amended statutory fee petition initially sought a lodestar of $2,357,750 of merits fees. Docket No. 1697 at 14:26-28 (amended fee petition); Docket No. 1699 ¶ 22 (McCoy Decl. in support of amended fee petition).  The amended fee petition states,

> Mr. McCoy did not maintain contemporaneous records of the time he and his office devoted to these particular cases, but we do have a reliable basis for reconstructing a portion of the time devoted to the cases, since Mr. McCoy attended depositions, court hearings and the trials themselves.  That portion of Mr. McCoy's time is not subject to much debate.  Much of the rest of his time is subject to reasonable estimation.
>
> We ask the Court to render a reasonable fee award to Mr. McCoy based on (a) that portion of his work for which we can, from the objective records in the cases, arrive at a reliable, but partial, lodestar, (b) Mr. McCoy's reasonable estimate of the additional time his office devoted to the actions, (c) the Court's direct observation of the work he performed in these two cases, and the value his work conferred on his clients, (d) the risks and challenges inherent in litigating these cases against FedEx, and (d) the fees Mr. McCoy incurred in having the undersigned counsel pursue the Ninth Circuit appeal and, following remand, represent him in connection with his fee appeal in this Court.  That final element of the fee request is supported by the contemporaneous time records of Mr. McCoy's counsel.

Docket No. 1697 at 1:24-2:12.

In response to numerous criticisms by FedEx regarding the deficiencies in the amended fee petition (discussed at greater length *infra*), McCoy's reply seeks a lodestar of $1,251,218.75.  Docket No. 1729 at 15:3 & Docket No. 1740 at 4:5-14 (transcript of May 27, 2011 hearing).[29]  Nowhere in either the amended fee petition or in the reply is there a clear breakdown of how McCoy arrived at either lodestar, nor does McCoy explain in either the reply memorandum or his reply declaration how he excised $1,106,531.25 from his lodestar between the filing of the amended petition and the reply.

McCoy has submitted two declarations in support of his amended fee petition: (1) an initial declaration, which contains estimates of his time, as well as estimates of time spent by other lawyers in his office, and (2) a reply declaration, supported by some invoices and other documents, which contains revised, and in some instances more detailed, estimates of his time and the time spent by other lawyers in his office.  However, comparing the two declarations does not aid the Court in determining

---

[29]   At the hearing, McCoy's fee counsel, Bass, stated that there was a mathematical error in calculating the lodestar in the reply brief, and that instead of $1,142,093.75 (the amount stated in the reply brief), the lodestar was $1,251,218.00.  *Id.*

how or why McCoy changed his estimates between the filing of the amended fee petition and the reply

brief.  Indeed, the closest McCoy comes to explaining the journey from the amended fee petition

lodestar to the reply lodestar was the following statement by Bass, McCoy's fee counsel at the May 27,

2011 hearing,

> The fact is that we performed a heroic act of liposuction on this application between the
> opening and reply papers.  And, in fact, the lodestar set forth in the reply papers on
> which we rely is something more than a million dollars less than the lodestar we put
> forth in the opening papers.  That was a very substantial effort on our part to get this
> down to a level that we thought would -- was reasonable, supportable, and would be
> viewed by the Court as appropriate.

Docket No. 1740 at 26:5-12.

The Court expects that any time a party files a fee petition, counsel should request "reasonable,

supportable and appropriate" fees in its initial petition – and, to the extent necessary, should have

performed "liposuction" *prior* to the filing of the fee petition.  The failure to do so is particularly

egregious here in light of the history of litigation over McCoy's original fee petition, as well as the

representation to this Court on remand that any amended fee petition would be "reliable" and "legally

sufficient."  Docket No. 1641 at 1:21, 2:17.  McCoy has presented FedEx and this Court with a moving

target, making the determination of a reasonable fee exceptionally difficult.  McCoy's two declarations

contain shifting and unclear descriptions of how much time was spent by which timekeepers on which

tasks.  For example, McCoy's initial declaration[30] provides the following description of the time spent

by other attorneys and employees in his office:

> 18.    I have reviewed time reports submitted by other attorneys and employees in my
> office who were either specifically hired to work on the FedEx cases, or who devoted a
> substantial proportion of their time to these cases.  Those records do not reflect specific
> time entries for particular tasks.  Rather, they reflect the time worked by these
> individuals, and they supported the compensation that I paid them.  But I know what
> matters these individuals were working on, and I have been able to derive from those
> records the following estimates of time, totaling 2,822.5 hours:
>
> (a)    For the month of April 2004, Zak Best devoted approximately 2 hours to
> working on research.
>
> (b)    For the month of May 2004, Zak Best devoted approximately 2.5 hours to
> working on the opposition to the 26(f) disclosures.

---

[30] For current purposes, McCoy's "initial" declaration is the declaration he filed on March 4,
2011 in support of the amended fee petition, not any of the declarations he filed in support of the
original fee petition.

United States District Court
For the Northern District of California

(c)     For the month of June 2004, Zak Best devoted approximately 7.5 hours to working on an ex parte motion.

(d)     For the month of November 2004, Zak Best devoted approximately 7 hours to working on discovery.

(e)     For the month of December 2004, Zak Best devoted approximately 4.5 hours to working on discovery.

(f)     For the month of March 2005, Zak Best devoted approximately 1.5 hours to working on discovery.

(g)     For the month of April 2005, Zak Best devoted approximately 50.5 hours to working on opposition to the summary judgment motions

.

(h)     Attorney Spencer Smith devoted approximately 1800 hours to the Alvarado and Boswell matters from December 2005 to 2008.

(i)     For the month of August, 2005, Joseph Poppen devoted approximately 42.5 hours to working primarily on the oppositions to the summary judgment motions.

(j)     For the month of September, 2005, Joseph Poppen devoted approximately 98.75 hours to working primarily on the oppositions to the summary judgment motions.

(k)     For the month of October, 2005, Joseph Poppen devoted approximately 171.5 hours to working primarily on the oppositions to the summary judgment motions.

(l)     For the month of November, 2005, Joseph Poppen devoted approximately 170.75 hours to working primarily on the oppositions to the summary judgment motions.

(m)    For the month of December, 2005, Joseph Poppen devoted approximately 163 hours to working primarily on the oppositions to the summary judgment motions.

(n)     For the month of January, 2006, Joseph Poppen devoted approximately 32.5 to working primarily on the oppositions to the summary judgment motions.

(o)     For the month of August, 2005, Carolyn Ortler[31] devoted approximately 89.5 hours to working primarily on the oppositions to the summary judgment motions.

(p)     For the month of September, 2005, Carolyn Ortler devoted approximately 153 hours to working primarily on the oppositions to the summary judgment motions.

(q)     For the month of October, 2005, Carolyn Ortler devoted approximately 25.5 hours to working primarily on the oppositions to the summary judgment motions

Docket No. 1699 ¶ 18.  The non-McCoy time totals 2,822.5 hours, at a blended rate of $375/hour, for a total lodestar of $1,058,437.50.  In his original declaration, McCoy stated that, taking into account the time reflected in Paragraph 18 (quoted above), along with the estimates of his own time contained in

---

[31]     McCoy's declaration misspelled Ortler's last name, and he corrected it in the reply declaration.

United States District Court
For the Northern District of California

Paragraphs 13-17 and 19, "the total value of my firm's time would be $2,357,750.00. As set forth in Paragraph 20, I believe that this figure reflects only about 80 percent of the actual value of the time invested in these cases by my firm, before any multiplier is applied." *Id*. ¶ 22.[32]

However, by the time of McCoy's reply papers and reply declaration, McCoy only seeks a total of 291 hours for his associates' time, for a lodestar of $109,125.00. Presumably the missing 2,531.50 hours, for a lodestar of $949,312.50, is most of the excess fat that counsel heroically removed between the filing of the amended fee petition and reply papers. However, the reply brief and McCoy's reply declaration are silent about the fact that such liposuction has occurred, and there is *no* explanation of these excisions in either the reply brief or McCoy's reply declaration.

Another example of the shifting and inconsistent estimates of time spent relates to the summary judgment oppositions. In its brief on these motions, FedEx noted that the Alvarado summary judgment motion was filed on September 6, 2005 (Docket No. 224), the Boswell summary judgment motion was filed on September 1, 2005 (Docket No. 215), plaintiffs' oppositions were filed on October 5, 2005 (Docket Nos. 276, 278), and yet McCoy's initial declaration claimed that attorneys Best, Poppen and Ortler spent 182.50 hours working on the summary judgment oppositions before the motions were even filed (time spent in April and August 2005), and he claimed they spent 563.25 hours working on the oppositions *after* those oppositions were filed (time spent in October, November and December of 2005, and January 2006). McCoy's amended fee petition and initial declaration claimed a total of 997.25 hours for Best, Poppen and Ortler for the summary judgment oppositions, for a total summary judgment opposition lodestar for these three individuals of $373,968.75 (997.25 at $375/hour). In addition, McCoy's initial declaration stated that he spent approximately 36 hours of his own time on the summary judgment oppositions:

---

[32] Paragraph 20 of McCoy's initial declaration states, "Because of the absence of contemporaneous time records, I do not feel that I am in a position to provide the exact time devoted to these cases by myself or others in my office. However, I know that, during the years 2003, 2004, 2005, 2006, 2007, 2008, 2009, and 2010, I devoted a very substantial amount of time to the Alvarado and Boswell cases that is not captured in the above estimates. It is my belief that the estimates set forth in paragraphs 13-19 in fact capture less than 80 percent of the total amount of time that I and my office devoted to these cases." Docket No. 1699 ¶ 20. As discussed *infra* in Section II.B regarding the multiplier, McCoy asserts that this "lost time" is one reason why he is entitled to a multiplier of the lodestar.

15.    Third, I reviewed, supervised, and participated in our opposition to the first and second sets of motions for summary judgment filed by FedEx.  For each opposition, I reviewed, the motions for summary judgment (1.5 hours), summarized each deposition pertaining to each plaintiff (8 hours), reviewed the law pertaining to each claim (1 hour), drafted and reviewed drafts of facts (1.5 hours), reviewed drafts of legal arguments (1.5 hours), reviewed final drafts of opposition (2.5 hours), and reviewed reply briefs (2 hours).  I estimate that I devoted approximately 36 hours in total to these tasks.

Docket No. 1699 ¶ 15.  At $575/hour, McCoy claimed a $20,700 lodestar for his work on the summary judgment oppositions, for a combined total of $394,668.75.

McCoy's reply and reply declaration address the time claimed for working on the summary judgment motions differently:

FedEx filed motions for summary judgment in the *Alvarado* and *Boswell* actions.  Mr. McCoy was directly involved in opposing those motions, with the assistance of other attorneys in his office.  Mr. McCoy estimates that his firm spent approximately 120 hours opposing FedEx's summary judgment motions.  ([Reply Decl.] at ¶ 34).

Mr. McCoy was involved in the *Alvarado* litigation, and his work in opposing FedEx's summary judgment motions in that case was directly relevant to the motions FedEx would file in *Alvarado* and *Boswell*.  FedEx argues that Mr. McCoy could not have been "opposing" the *Alvarado* and *Boswell* motions in advance of their filing.  That is, of course, true in a technical sense.  But it is not true as a practical matter.  By FedEx's reasoning, it could not have commenced work "opposing" this fee application before it was filed on March 4, 2011.  But its attorneys may well have been preparing their opposition for weeks or months before then.  Mr. McCoy estimates that he spent 36 hours on tasks related to the summary judgment motions filed against FedEx's other employees, and his attorneys spent an additional 236 hours opposing those motions.  He is apportioning a small fraction (1/8) of that time, or 36 hours, to *Alvarado* and *Boswell*.  (McCoy Reply Decl. at ¶ 35).

Docket No. 1729 at 9:25-10:11.  The cited paragraphs of McCoy's reply declaration, in turn, state:

34.    I estimate that my office spent approximately 120 hours opposing FedEx's summary judgment motions.

35.    I estimate that I spent 36 hours on tasks related to opposing summary judgment motions filed against FedEx's other employees, and my office spent an additional 236 hours opposing those motions.  I am apportioning a fraction of time (1/8) of that time, or 36 hours,[33] to Alvarado and Boswell

Docket No. 1731 ¶¶ 34-35.

There are numerous unexplained inconsistencies between McCoy's original and reply

---

[33] The Court is unclear how McCoy arrived at 36 hours as a fraction of this time.  Presumably, McCoy means that he is only seeking 1/8 of the time he (36 hours) and his office (236 hours) spent on the non-Alvarado and Boswell summary judgment oppositions.  That total is 272 hours, one-eighth of which is 34 hours.

declarations. McCoy originally claimed 997.25 hours for time spent by Best, Poppen and Ortler on the summary judgment oppositions, and he did not in any way seek to apportion that time between time spent on Alvarado and Boswell; he sought that full amount (997.25 hours, for a lodestar of $373,968.75) in his amended fee petition. In his reply brief, McCoy states that his "office" – presumably Best, Poppen and Ortler – spent 236 hours opposing the non-Alvarado and Boswell summary judgment motions, and he states he is only seeking payment for 1/8 of that time (29.5 hours) in his fee petition. In addition, McCoy's reply declaration claims that "his office" spent 120 hours on the Alvarado and Boswell summary judgment oppositions. Does the 120 hours include the 36 hours of his own time that McCoy claimed in his original declaration? Docket No. 1699 ¶ 15. If so, then Best, Poppen and Ortler only spent 84 hours on the Boswell and Alvarado summary judgment oppositions, according to McCoy's reply declaration, in stark contrast to the 997.25 hours claimed in the original declaration. If the 120 hours does not include McCoy's time, it is still far less than the 997.25 hours. Further, even if the 120 hours of time purportedly spent solely on Alvarado and Boswell's motions is combined with all of the 236 hours of time spent on the non-Boswell and Alvarado motions, the total is only 356 hours: again, far less than the 997.25 hours originally claimed for Best, Poppen and Ortler. There is no explanation anywhere in McCoy's reply papers for this discrepancy in hours claimed.[34]

With regard to McCoy's claimed time, McCoy's reply declaration states that he spent 36 hours on tasks related to opposing the non-Alvarado and Boswell summary judgment motions, and that he is apportioning 1/8 of that time (4.5 hours) to Alvarado and Boswell. Docket No. 1731 ¶ 35. McCoy's original fee declaration, however, does not state anything about McCoy's time spent on the non-Alvarado and Boswell summary judgment oppositions, and instead claims 36 hours for his time spent on the Alvarado and Boswell oppositions. Docket No. 1699 ¶ 15.

McCoy's amended fee petition places great emphasis on the fact that California law does not

---

[34] As yet another example of the difficulty in determining how McCoy reached the numbers contained in his declarations, McCoy's reply papers state that he is seeking 291 hours of his associates' time for all work in these cases. Docket No. 1729 at 15:4. There is no breakdown of what McCoy includes in his "associates'" time, although presumably that includes the 215.5 hours he has estimated for summarizing deposition transcripts, leaving 75.5 hours for his associates. McCoy's reply declaration contains estimates of time he personally spent (such as conducting and preparing for depositions), and time spent by his "office" on pleadings and discovery. It is unclear what portion, if any, of this "office" time McCoy attributes to himself versus his associates.

United States District Court
For the Northern District of California

require time records to establish the lodestar. McCoy cites an excerpted passage in *Chavez v. Netflix, Inc.*, 162 Cal. App. 4th 43 (2008), for the proposition that declarations of counsel containing estimates are sufficient. *See* Docket No. 1697 at 6:20-27. However, the passage goes on to emphasize that in such circumstances the trial court has "wide discretion" to make deductions based upon its knowledge and experience presiding over the case:

> We start from the proposition that the "'experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.'" (*Serrano v. Priest* (1977) 20 Cal.3d 25, 49 [], quoting *Harrison v. Bloomfield Building Industries, Inc.* (6th Cir. 1970) 435 F.2d 1192, 1196). Further, detailed time sheets are not required of class counsel to support fee awards in class action cases. (*Wershba v. Apple Computer, Inc., supra*, 91 Cal. App. 4th at p. 254-55, []). The court may award fees based on time estimates for attorneys who do not keep time records. (*Margolin v. Regional Planning Com.* (1982) 132 Cal. App. 3d 99, 10006-1007 []).
>
> It follows from these authorities that the trial court has wide discretion in making reductions based on its estimate of time spent on activities that are noncompensable in whole or in part. Here, the trial judge had been assigned to this litigation from its inception, and was familiar with the nature, extent, and reasonableness of class counsel's litigation services. The court made sizeable but reasonable reductions in the lodestar amount, based on reasons that it clearly explained and that Vogel does not question. Although it might have been better for the court to provide a separate breakdown of each of the three reductions it made in order to arrive at the $805,000 figure, Vogel offers no persuasive argument that it was required to do so.

*Chavez*, 162 Cal. App. 4th at 64.

Accordingly, the Court will make deductions in McCoy's lodestar based on the Court's estimate of time spent on activities that are noncompensable in whole or in part. As in *Chavez*, this Court has presided over the litigation since its inception, and the Court is "familiar with the nature, extent and reasonableness" of McCoy's litigation services. The Court finds that some portions of McCoy's amended fee petition are based on work that can be verified in part by reference to the Court's docket or the time recorded for depositions.[35] For the time that is based solely on McCoy's estimates, the Court has made deductions based on its experience presiding over this case, as well as its evaluation of what information, if any, McCoy has provided this Court in support of his estimates.

---

[35] In fact, a significant portion of what McCoy describes as "objectively verifiable" time is actually based on estimates. For example, McCoy calculated his trial time by "estimat[ing] that, for each of those trial days, I worked at least 11 hours on the Alvarado and Boswell cases, including in-court time and preparation/strategy during trial." Docket No. 1731 ¶ 14.

### 1.     Trial time and preparation

McCoy estimates that the Alvarado and Boswell trials took at least 168 hours . McCoy estimates that he spent at least 11 hours per day while in trial, plus one hour of travel time.  McCoy's trial time estimate also includes time spent traveling to and from Hawaii for the Norman Stites[36] deposition, as well as the time spent taking that deposition.  In the Court's experience, this is a reasonable estimate of time spent during trial.  Accordingly, the Court finds that McCoy's claimed time spent on trial is reasonable, and accordingly awards **$96,600** for this time (168 hours at $575/hour).[37]

McCoy estimates that he spent 27 hours of preparation time for each day of trial, for a total of 324 hours (324 hours at $575/hour = $186,300).  The Court finds such an estimate unreasonable, particularly in the absence of any further explanation or documentation as to how McCoy spent 27 hours preparing for each trial day.  Based on the Court's experience, and taking into account the fact that these trials were not particularly complicated, the Court finds that 18 hours of preparation time per trial day is more than reasonable.   Accordingly, the Court awards **$124,200** (216 hours at $575/hour).

### 2.     Court hearings

Based upon the Court's docket, McCoy estimates that he attended 20 hearings and case management conferences, and three telephonic hearings.  McCoy estimates that some in-court appearances required two hours of his time, and others required four hours, which includes time spent waiting for his case to be called as well as time that he actually spent participating in the hearing. McCoy estimates that each telephonic hearing required an average of one-half hour of time.  McCoy also estimates one hour of travel time for each in-court appearance.

In response, FedEx notes, *inter alia*, that the minutes reflect that McCoy did not attend three of the claimed hearings or conferences.  *See* Docket Nos. 82 (McCoy claimed 2 hours), 216 (McCoy claimed .5 hours), 819 (McCoy claimed 2 hours).  Incredibly, despite FedEx pointing this out in the

---

[36] McCoy's papers repeatedly misspell "Stites" as "Stitez."  Stites was a central figure in the Boswell case, as Stites was the supervisor who, the jury found, sexually harassed Boswell.

[37] FedEx objects to McCoy's hourly rate.  The Court finds that this rate is supported by the record.

United States District Court
For the Northern District of California

opposition, McCoy's reply declaration still seeks to recover for these three hearings and conferences that he did not attend. Moreover, even for those hearings that he did attend, there are significant problems with McCoy's time estimates. In the Court's experience, *no* hearings in this case lasted four hours (including time spent waiting for the case to be called), and very few, if any, lasted two hours. The Court typically holds civil law and motion calendar on Fridays at 9 am, and the civil calendar is almost always completed prior to 11 am, when the criminal calendar begins. At a maximum, a court hearing in this case would last two hours. Moreover, a number of the hearings related to summary judgment motions solely concerning other plaintiffs. *See, e.g.*, Docket No. 197 (minutes for Aug. 19, 2005 hearing on summary judgment motions against plaintiffs Azzam, Paogofie and Wilkerson). With regard to case management conferences, the Court holds case management conferences at 3:00 pm on Fridays; the last case management conference is typically over around 4:30 pm. Thus, even if McCoy's case was called last for the case management conference, and he appeared at Court at 2:45 pm, that would be a total of 1.75 hours (not including travel time).

Accordingly, the Court has examined the docket and compared each minute entry with each claimed hearing to determine (1) whether McCoy attended the hearing, (2) the substance of the hearing or case management conference, and (3) how long the proceeding lasted, either as noted on the minutes, or, if there is no time notation, the Court has made an estimate[38] based on its experience presiding over this case. The Court awards the following: (1) July 30, 2004 initial case management conference: 1.75 hours; (2) October 22, 2004 cmc: 1.75 hours; (3) March 17, 2005 telephone hearing: .5 hours; (4) June 27, 2005 telephone conference: .5 hours; (5) October 7, 2005 hearing regarding discovery: 1 hour; (6) November 10, 2005 summary judgment hearing re: Alvarado: 1.5 hours; (7) November 21, 2005 summary judgment hearing re: Boswell: 1.5 hours; (8) April 25, 2006 case management conference, 1.75 hours; (9) May 19, 2006 hearing: .75 hours; (10) August 15, 2006 pretrial hearing: 2 hours; (11) January 12, 2007 hearing: 1.5 hours; (12) Feb. 15, 2007 cmc: 1.75 hours; (13) May 4, 2007 hearing: 1.5 hours; (14) July 16, 2007 cmc: .5 hours; (15) November 7, 2008: 2 hours; (16) Feb. 4, 2011 hearing: 2 hours. The total hours are 22.25 hours at $575/hour = **$12,793.75**.

---

[38] The Court's time estimates are generous in that they assume counsel arrived early, his case was not called first on the calendar, and that there was substantial argument.

United States District Court

For the Northern District of California

44

The Court awards no time for those hearings that McCoy claimed but did not attend (March 11, 2005 hearing, August 31, 2005 cmc, and May 7, 2007 cmc). Further, the Court awards no time for hearings spent solely on matters that do not relate to Boswell and Alvarado[39], such as the motions for summary judgment as to other plaintiffs (August 19, 2005, October 25, 2005) and for the litigation regarding attorneys' fees and the settlement plaintiffs (Dec. 14, 2007, Feb. 1, 2008 Feb. 25, 2009).[40]

### 3. Depositions

McCoy is seeking time for taking, defending and/or attending a number of depositions (215.5 hours at $575/hour = $123,912.50, Docket No 1731 ¶ 11); (2) preparing for those depositions (450 hours at $575/hour = $258,750, Docket No. 1731 ¶ 30)[41]: and (3) time spent by his office summarizing each deposition transcript (215.5 at blended rate of $375/hour for all other staff = $80,812.50, Docket No. 1731 ¶ 31). The total claimed for depositions is $463,475.00.

FedEx objects that many of the depositions do not relate to Alvarado and Boswell. For example, the deposition of Kalini Boykin[42] was taken in the *Satchell* case; Boykin was one of the named plaintiffs in that case. In addition, FedEx argues that simply because the deponents were other plaintiffs in this case, or FedEx employees who supervised other plaintiffs, does not mean that these depositions were used to develop the facts of either Alvarado or Boswell's cases. McCoy asserts, in contrast, that all of the depositions were necessary to developing common factual and legal theories, and that all of the depositions were useful in some way to these cases.

The Court has reviewed the list of depositions and finds that some of the deposition time is fully

---

[39] In contrast, the Court is awarding time spent at hearings that only partially related to Boswell and Alvarado. *See, e.g.*, Docket No. 1239.

[40] The Court notes that the minutes for the February 25, 2009 hearing state that the hearing lasted 22 minutes, and yet McCoy "estimates" that he spent four hours at that hearing. *Compare* Docket No. 1315 *with* Docket No. 1699 ¶ 14.

[41] McCoy estimates that he spent three hours preparing for every one hour of a deposition that he took or defended, and that he spent one hour preparing for every one hour of a deposition that he attended. Docket No. 1731 ¶ 30. The Court finds those estimates reasonable.

[42] Boykin's name is misspelled in McCoy's reply declaration as "Kalime Baykin." Docket No. 1731, Ex. A at 1.

United States District Court
For the Northern District of California

recoverable (e.g., the depositions of Norman Stites and plaintiffs' experts)[43] because that time all went toward developing Alvarado and Boswell's cases. With regard to the depositions of the other plaintiffs and the FedEx managers, the Court finds that the time spent on those depositions is recoverable at 60%. A number of the other plaintiffs worked at the same facilities as Alvarado (Sunnyvale) and Boswell (Oakland), and even those plaintiffs who did not work at those facilities (e.g., the San Leandro facility) had interactions with the FedEx managers who were involved in Alvarado and Boswell's cases. Likewise, the depositions of FedEx managers and HR personnel, even if those individuals were not directly involved in the Alvarado and Boswell cases, were necessary to developing the factual background of these cases. Accordingly, the Court awards **$294,637.50** which is based on:

- **$16,675** for June 29, 2005 Stites deposition (8 hours deposition time; 21 hours preparation time, at $575/hour)

- **$12,075** for March 22, 2007 Stites deposition (21 hours preparation time at $575/hour)[44]

- **$9,200** for Stanley Stephenson deposition (4 hours deposition time; 12 hours preparation time, at $575/hour)

- **$206,625** for time spent attending and preparing for all other depositions (102 hours spent by McCoy conducting depositions, and 306 hours spent preparing for those depositions; 63.5 hours spent attending depositions conducted by Parker, and 63.5 hours spent preparing for those depositions, all at $575/hour; and 24.5 hours for depositions conducted by Rachel Orejana,[45] and 73.5 hours spent preparing for those depositions, at $375/hour). McCoy's total lodestar = $307,625 and Orejana's total lodestar = $36,750. Total lodestar = $344,375 at 60% = $206,625.

---

[43] According to Exhibit A attached to McCoy's reply declaration, Stites was deposed twice, on June 29, 2005 and March 22, 2007. McCoy has included the March 22, 2007 deposition time in his trial time, and thus the time spent taking the March 22, 2007 deposition is not separately recoverable in "depositions." The Court has included the time spent summarizing the deposition transcripts, and time spent preparing for both depositions, in "depositions."

[44] The time spent taking this deposition has been included in McCoy's trial time.

[45] For those depositions listed as being solely conducted by Orejana, the Court applies the $375 hourly rate, rather than McCoy's higher rate.

46

United States District Court
For the Northern District of California

- **$50,062.50** for time spent summarizing above depositions (15.5 hours for Stites deposition and 4 hours for Stephenson deposition, total of 19.5 hours at $375/hour = $7,312.50); 190 hours spent summarizing other depositions at $375/hour = $71,250, at 60% = $42,750. Total for summarizing depositions = $50,062.50.

### 4.    Time spent on pleadings, early factual investigation

McCoy seeks fees "for 92 hours of work with respect to the development of the factual bases for filing these complaints and moving these cases toward discovery." Docket No. 1731 ¶ 23. This time includes (1) an estimated 20 hours that McCoy's "office" spent drafting, editing and filing the opposition to the motion to sever and the different complaints, *id.* ¶ 13; (2) an estimated 42 hours (7% of an estimated total 600 hours) spent beginning in July 2002 on investigating and analyzing facts common to Alvarado's and Boswell's claims, general legal research, legal research on possible class-wide claims, and efforts to settle claims for 30 different plaintiffs prior to filing the class complaint, including a November 2002 mediation, *id.* ¶¶ 18-19; (3) an estimated 30 hours spent in 2003, after the filing of the *Satchell* complaint, "in substantial negotiations with co-counsel and FedEx with respect to amending the pleadings, as well as re-filing Alvarado's and Boswell's individual claims, *id.* ¶¶ 20-21; and (4) an estimated 20 hours in 2004 "handling [] tasks" related to the filing of the Alvarado and Boswell complaint in 2004. *Id.* ¶ 22. McCoy does not provide an estimate of how much time was spent by him personally, as opposed to "his office." In addition, McCoy does not explain the difference between the time spent in category 1 working on "the different complaints," and the time estimated in the other categories for working on the *Satchell* complaint, and ultimately, the *Alvarado* complaint.

In light of the fact that during this time period McCoy had a number of co-counsel in the *Satchell* action who were actively involved in litigating that case, and because of the apparent overlap between some of these categories, the Court finds that 70 hours is a more reasonable amount of time spent on these activities, with 50 hours allocated to McCoy and 20 hours allocated to his associates for a lodestar of **$36,250** (50 hours at $575/hour + 20 hours at $375/hour).

### 5.    Non-deposition discovery

47

McCoy estimates the following: (1) 24 hours propounding 86 document requests and reviewing FedEx's initial disclosures; (2) 40 hours spent reviewing FedEx's documents; (3) 10 hours meeting and conferring with FedEx regarding discovery disputes; (4) 71 hours "managing" Parker's involvement in meet and confer efforts; and (5) 1200 hours (50 hours each month, for each month in 2004 and 2005) spent "assessing, strategizing and developing the factual record for both cases," including "discussing and analyzing the facts and their development," "organizing and characterizing those facts," "developing strategies with respect to how to use those facts" and "identifying discovery needs on an ongoing basis." Docket No. 1731 ¶¶ 26-29, 32-33. The total of these hours is 1345, and aside from the meet and confer time (and the time spent "managing" Parker's meet and confer efforts), McCoy's declaration does not apportion any of the time spent between him personally and his office.

The Court finds McCoy's estimates are reasonable, except for the 50 hours each month spent on generalized analysis and strategy. To be sure, lawyers and their staff are required to spend a significant amount of time digesting and analyzing facts uncovered in discovery. However, in the absence of either a more substantive basis for McCoy's estimate (for example, McCoy could have been more specific in the types of discovery at issue and how his office organized and characterized the facts, developed strategies with respect to use those facts, etc.), or any contemporaneous billing records, the Court finds that a more reasonable estimate of such time is 25 hours per month for both cases, for a total of 600 hours for 2004 and 2005. In addition, with the exception of the meet and confer time (10 hours McCoy spent and 71 hours McCoy spent "managing" Parker's meet and confer efforts), the other non-deposition discovery time should be divided between McCoy and his associates, with 50% of that time allocated to McCoy and 50% of that time allocated to his associates. The Court finds that this is appropriate because a number of discovery tasks – drafting discovery requests, reviewing documents, organizing facts – are generally performed by junior associates, with supervision by a more senior attorney.

Accordingly, the Court awards **$331,575** which is based on: (1) $46,575 (81 hours spent on meet and confer, at $575/hour), and (2) $285,000 (300 hours at $575/hour and 300 hours at $375/hour).

### 6.    Summary judgment oppositions

United States District Court
For the Northern District of California

As discussed above, McCoy's amended fee petition presents inconsistent estimates of how much time he and his office spent on the summary judgment oppositions. The Court finds it reasonable to award McCoy 36 hours for his time spent on the Alvarado and Boswell oppositions, and an additional 50 hours for his office. While the Court agrees that time spent developing related claims – such as time spent in depositions or other discovery that is used for all plaintiffs – is recoverable, the Court finds that time spent opposing FedEx's motions for summary judgment on other plaintiffs is not recoverable as that time was not spent developing a common core of facts or related legal theories.

Accordingly, the Court awards a total of **$39,450** (36 hours at $575/hour + 50 hours at $375/hour).

### 7.   Summary of merits fees

| | |
|---|---|
| Lodestar sought in amended fee petition: | $2,357,750.00 |
| Lodestar sought in reply: | $1,251,218.75 |
| Deductions by Court: | - $315,712.50 |
| Adjusted lodestar | **$935,506.25** |

## B.   Multiplier

McCoy seeks a 2.0 multiplier. In support of his request for a multiplier, McCoy asserts – incorrectly – that "both plaintiffs proved unlawful retaliation, disparate treatment, disparate impact and racial discrimination. Boswell proved gender discrimination and sexual harassment as well." Docket No. 1729 at 14-15. In fact, the jury found in favor of Alvarado on his retaliation claim, and against him on his disparate treatment/race discrimination claim. Docket No. 526 (Alvarado special verdict). No "disparate impact" claim went to the jury. *Id*.[46] With regard to Boswell, the jury found in her favor on her claims for retaliation (based on resisting Stites' sexual advances), sexual harassment and constructive discharge; no claims for race discrimination or disparate impact went to the jury. Docket

---

[46] McCoy also incorrectly states that Alvarado's $500,000 damages award was subsequently reduced to $300,00 due to an erroneous jury instruction. Docket No. 1697 n.2. In fact, the Court remitted the damages award to $300,000, finding that "the jury's award of $500,000 in emotional distress damages is excessive and unsupported by the evidence, and that it should be reduced to $300,00." Docket No. 1035 at 5:7-11. The Court's remittitur had nothing to do with an erroneous jury instruction.

1   No. 762 (Boswell special verdict).  Thus, one of the asserted bases for a multiplier is simply not true.

2

3   McCoy also asserts that a 2.0 multiplier is warranted to account for "lost time": "If the lodestar

4   reflected all of Mr. McCoy's time, then we would propose a 1.5 multiplier, to account for the risk he

5   assumed in prosecuting the cases through trial.  In light of the substantial amount of 'lost' time – that

6   is, time for which Mr. McCoy lacks sufficient records upon which to base a reliable estimate or

7   reconstruction – we propose a 2.0 multiplier."  Docket No. 1697 at 10:16-20.

8   The Court exercises its discretion and finds that a multiplier is not appropriate.  As an initial

9   matter, "the trial court need not consider a multiplier when presented with an inflated, unreasonable fee

10  request."  *Christian Research Inst.*, 165 Cal. App. 4th at 1329.  Here, despite being given the

11  opportunity to file an amended fee petition on remand, McCoy's amended fee petition contained – by

12  Bass' own admission – over $1 million in excess fat that needed to be removed by "liposuction" by the

13  time of the reply brief.  Even then, the Court made further deductions to McCoy's claimed lodestar.

14

15  The Court is also not persuaded by McCoy's assertion that he is entitled to a multiplier to

16  account for the estimated 20% of time "lost" as a result of not keeping contemporaneous time records.

17  McCoy does not cite any authority for the proposition that a lawyer is entitled to a multiplier of the

18  lodestar because he "lacks sufficient records upon which to base a reliable estimate or reconstruction."

19  Docket No. 1697 at 10:19.  Further, for all of the reasons discussed *supra*, the Court does not have much

20  confidence in McCoy's "estimates" of time spent, and thus his estimate that 20% of total time has been

21  "lost" is suspect.  Finally, while plaintiffs' success at trial is in large part attributable to McCoy, the

22  Court finds that an over $1 million merits fee award, based on an hourly rate of $575/hour, is reasonable

23  given the circumstances.

24

25  **C.  Merits expenses**

26  McCoy seeks $138,796.93 in costs.  McCoy's reply states that "McCoy combed through his

27  records and has identified costs that exceed $192,685.  He is claiming only a portion of those costs.

28  McCoy's records reflect that his firm spent more than $138,796.93 in costs with respect to tasks required

50

United States District Court

For the Northern District of California

to prove FedEx's discrimination and retaliation against Alvarado and Boswell. ([McCoy Reply Decl.] ¶¶ 39-47." Docket No. 1729:12-16. The cited portions of McCoy's reply declaration, in turn, set forth the costs sought, and McCoy has attached copies of invoices, checks etc., showing payments made. Docket No. 1731 ¶¶ 39-47, Ex. C-I.[47] McCoy seeks the following costs: (1) $51,489.73 for deposition costs; (2) $102,000 for expert witness fees; (3) $3,824 for online legal research costs; (4) $15,877.23 for Special Master fees; (5) $4,407.70 for transcripts for hearings before the Special Master; (6) $2,224.80 for court costs; and (7) $23,725.02 for contract attorney costs. The total of these amounts is $203,548.48. Docket No. 1731 ¶¶ 38-47.

The Court has reviewed the documents submitted by McCoy and finds that these costs are generally recoverable, though the Court has made deductions because the documents that McCoy has submitted do not support the amounts claimed. The Court awards a total of **$100,013.51** in costs, as follows:

- Deposition costs: McCoy has submitted checks and other documents showing payments of **$18,268.51**, and accordingly the Court awards that amount.[48]

- Expert witness fees: McCoy has submitted checks and other documents showing payments of $50,000 to Stan Stephenson or Litigation Economics LLC. McCoy has not submitted any other documentation reflecting any other payments to experts, nor does McCoy explain how he arrived at the $102,000 figure. Accordingly, the Court awards **$50,000**.

- Online legal research: McCoy has submitted documentation reflecting payments of **$4,851.76**, and accordingly the Court awards that amount.

- Special Master fees: McCoy seeks $15,877.23 in fees paid to the Special Master. Docket No. 1731, Ex. F. However, McCoy has only submitted checks showing a total of $12,877.24 paid to the Special Master. Accordingly, the Court awards **$12,877.24**.

---

[47] McCoy's reply declaration also includes Exhibits J, K and L, which are not addressed in McCoy's declaration. The Court addresses those costs *infra*.

[48] Exhibit C contains numerous duplicates of checks and invoices totaling $13,998.51.

- Transcript for Special Master's hearings: **$4,407.70**.[49]

- Court costs: McCoy seeks $2,224.80 in court costs. Docket No. 1731, Ex. H. As an initial matter, McCoy has only submitted checks totaling $1,731.80. *Id.* Moreover, $910 of the costs sought were in connection with *Satchell* – specifically, McCoy's appeal of the Court's April 2, 2008 Order Granting Plaintiffs' Motion for Declaratory Relief. *See* Docket Nos. 846 & 847 in C 03-2659 SI. In addition, $247 of the costs sought were fees paid to Alameda County Superior Court in 2006. McCoy does not explain how these state court fees are connected to, or recoverable in, this case. Accordingly, the Court deducts these costs, and awards **$574.80**.

- Contract attorney costs: McCoy has submitted copies of checks that he wrote to attorneys Joseph Poppen and Carolyn Ortler. Docket No. 1731, Ex. I. McCoy states that he is seeking these costs as expenses because the Special Master recommended awarding Parker contract attorneys' costs as expenses. However, Parker sought the contract attorneys' costs only as costs, and did not also seek them as part of her fee lodestar. Here, McCoy has included Poppen and Ortler's time in his estimate of the fee lodestar, Docket No. 1699 ¶¶ 18, 22, and presumably their time is included in the 291 hours of associates' time that McCoy still sought as of the reply. Accordingly, the Court finds that this time is already included in the fee lodestar, and will not be awarded as costs.

- Exhibit J: Although not addressed in McCoy's reply or reply declaration, McCoy has submitted copies of invoices for mediation in the Alvarado and Boswell cases. The total of these invoices (not counting the duplicate invoice submitted) is **$8,953.50**, and the Court awards that amount.

- Exhibit K: This exhibit is also not addressed in McCoy's reply or reply declaration. Exhibit K contains numerous copies of checks written to Office Depot and other payees for "office supplies" or "FedEx supplies." One check contains the notation "For Pernell Subpoenas," which is presumably a reference to subpoenas for plaintiff Pernell Evans'

---

[49] Exhibit G contains numerous duplicate checks and invoices.

United States District Court
For the Northern District of California

case. As a general matter, office supplies are part of overhead and thus not recoverable. As McCoy has not advanced any argument why any of these costs are recoverable, and because on their face these costs appear to be unrecoverable, the Court will not award any of these costs.

- Exhibit L; This exhibit is also not addressed in McCoy's reply or reply declaration. Exhibit L contains copies of checks written to trial witnesses for witness fees. Two of the checks are for witnesses in the Boswell trial; those fees are recoverable, and the Court awards **$80.00**. The remaining checks are for witnesses in Pernell Evans' trial; those costs are not recoverable.

**D.** **Fees-on-fees**

**1.** **Lodestar**

McCoy's fee counsel seeks a lodestar of $230,929, and a 2.5 multiplier for a total fee of $577,322.50. Unlike McCoy, his fee counsel have submitted contemporaneous billing records in support of the fees-on-fee request.

FedEx contends that McCoy's fee counsel is not entitled to any fees-on-fees. FedEx argues that most of the fees-on-fees work was incurred litigating the Ninth Circuit appeal or on remand before the filing of the amended fee petition, work which FedEx characterizes as "solely related to McCoy's bad faith conduct, and is not recoverable as a statutory fee-on-fee under Title VII or FEHA." Docket No. 1713 at 16-17. With respect to the amended fee petition, FedEx argues that the Court should not award fees-on-fees because the amended fee petition is deficient. FedEx also notes that McCoy and his fee counsel have a "partial contingency" agreement that weighs in favor of denying fees. According to Bass' declaration,

> I agreed to represent Mr. McCoy in this matter on a partial contingency basis. That is, my firm was to be paid fees at a discounted hourly rate, along with a contingency payment in the event that Mr. McCoy received a statutory award from FedEx Corporation. I thought it likely that payment of all of our fees would be contingent as a practical matter.

Docket No. 1698 ¶ 5.

The Court finds that McCoy's fee counsel are entitled to the fees-on-fees sought, with one small

United States District Court
For the Northern District of California

deduction. The Court concludes that the Ninth Circuit appeal, and the motion for leave to file an amended fee petition on remand, are recoverable because they were undertaken in order to preserve McCoy's right to pursue a statutory fee award. *See generally Ketchum*, 24 Cal. 4th at 1133-34 & 1141 (affirming trial court's award of lodestar that included primary litigation as well as fees-on-fees for the initial fee motion, a full evidentiary hearing on fee issues, motions for stay and reconsideration of the fee award, and subsequent determination of supplemental attorneys' fees and costs).

The Court does find it appropriate to make a deduction of 13.5 hours billed in April 2011 regarding an unnecessary disagreement between McCoy's fee counsel and counsel for FedEx and Parker regarding the application of the Civil Local Rules to the briefing schedule in this case. *See* Docket No. 1722. The Court finds that McCoy's fee counsel took unreasonable positions with regard to scheduling, and accordingly the Court reduces the fees-on-fee award by $6284.[50] Accordingly, the Court awards **$224,645** in fees-on-fees to McCoy's fee counsel.[51]

## 2. Multiplier

The Court exercises its discretion and finds that a multiplier is not warranted for a number of reasons. As discussed *supra*, the amended fee petition suffers from numerous deficiencies, including but not limited to, the following: (1) the amended fee petition contained over $1 million in fees that were excised without explanation by time of the reply brief, (2) McCoy's initial and reply declarations contain shifting and confusing descriptions of his time estimates, (3) nowhere in the amended fee petition is there a clear, line-item breakdown of the fees or costs sought, (4) McCoy's initial and reply declarations continued to seek fees for attending hearings that McCoy did not attend, despite FedEx raising this point in its opposition brief, and despite the fact that the Court's minutes state which attorneys attended the hearings, (5) the amended fee petition asserted factual arguments that were

---

[50] The Court has deducted all entries on page 3 of Docket No. 1730, Ex. A, and the 4/17/11, 4/18/11, and 4/19/11 entries for Julia D. Greer found on page 4 of that exhibit.

[51] Although the Court applied a percentage reduction to Parker's fees-on-fees, the Court does not find it appropriate to apply a percentage reduction to McCoy's fees-on-fees because, *inter alia*, the amount sought by McCoy's fee counsel is significantly more reasonable than the amount sought by RBG.

1   incorrect and that were easily verifiable (e.g., the basis of Alvarado and Boswell's jury awards), and (6)

2   the costs sought by McCoy are, in significant part, not supported by the documentation he provided, and

3   McCoy sought to recover costs from other cases and matters.[52]

4

5                    **3.    Fees-on-fees expenses**

6        Bass seeks a total of $6,647.75 in costs.  The Court finds that the costs are documented and

7   appropriate, and accordingly awards **$6,647.75** in fees-on-fees costs.

8

9        **E.    Post-judgment interest**

10       The Court awards post-judgment interest at the applicable rate of interest on March 18, 2008,

11   the date that Boswell's amended judgment was entered (and thus the date that McCoy's entitlement to

12   fees was fixed).[53]  *See* 28 U.S.C. § 1961.

13

14

15

16

17

18       [52]   McCoy's fee counsel asserts that a multiplier is warranted because "this case presented a set
    of legal questions that were both highly novel and extremely difficult."  Docket No. 1697 at 12:17-18.
19   True, yet the novelty and complexity were, in large part, of McCoy's own making.  The Court struck
    McCoy's first fee petition after finding, based on an extensive record, that McCoy had repeatedly
20   misrepresented, under oath, the provenance of his fee petition.  Those findings were upheld by the Ninth
    Circuit.  Bass is correct that he skillfully litigated the Ninth Circuit appeal, and that the questions raised
21   in that appeal were complicated.  However, there never would have been a Ninth Circuit appeal if
    McCoy had been forthright in the first place; if McCoy had originally presented the Court with a fee
22   petition similar to his amended fee petition, based on estimates with reference to the docket and other
    objectively verifiable sources, the Court would have awarded McCoy a statutory fee award.  Bass also
23   emphasizes his skill, on remand, in prevailing on McCoy's motion for leave to file an amended fee
    petition. That success, however, must be viewed in the context of the Ninth Circuit's admonition to
24   consider the effect of denying McCoy a statutory fee on McCoy's former clients.  More importantly,
    the skill in securing the opportunity to file an amended fee petition has been undercut by the quality of
25   the amended fee petition itself.

26       [53]   The amended judgment in Boswell's case was entered on March 18, 2008.  Docket No. 1039.
    The amended judgment in Alvarado's case was entered on April 1, 2008.  Docket No. 1057.  It is the
27   Court's view that it is simpler to use one date for purposes of calculating accrued interest because
    McCoy's fee petition largely does not differentiate between Alvarado and Boswell's cases.  Further, the
28   amended judgments were filed two weeks apart, and thus the difference in interest accrued is minimal.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

**CONCLUSION**

For all of the reasons stated in this order, the Court finds that the statutory fee awards to Parker and McCoy are reasonable.  Both attorneys have already received contingent and *quantum meruit* fees for their work performed on behalf of the settlement plaintiffs (Parker received $137,900 and McCoy received $413,700), and both attorneys received significant statutory fees in *Satchell* (Parker was awarded $358,182.19 and McCoy was awarded $1,070,000.00).  While the Court has calculated the instant statutory fee awards based on counsel's work in the Alvarado and Boswell cases, the Court takes note of the other fees received by Parker and McCoy because, by counsel's own admission, there was substantial overlap in work performed on behalf of the settlement plaintiffs and Alvarado and Boswell, and, to a lesser extent, in the work performed in *Satchell* and this case.

The Court also has heeded the Ninth Circuit's caution to consider the possible effect on the plaintiffs of denying McCoy a statutory fee, namely that "if McCoy is unable to collect statutory attorney's fees from FedEx he may be able to collect contractual attorney's fees from the clients.  In that event, it would be the clients rather than McCoy who would suffer the adverse consequences of McCoy's misconduct in seeking fees."  Docket No. 1553 at 6.  It is the Court's view that because the statutory fee awards granted in this order exceed 40% of the jury awards sustained on appeal, neither Parker nor McCoy is entitled to any contingent fees from trial clients Alvarado and Boswell.[54]

Based on the foregoing, the Court awards the following:

Parker

- • $375,139.80 in merits fees;

- • $95,009.63 in merits expenses;

- • $367,001.04 in fees-on-fees (RBG's portion = $357,078.54; Parker's portion = $9,922.50);

- • $55,602.13 in fees-on-fees expenses; and

- • Post-judgment interest at the rate of 2.19 percent beginning June 5, 2008.

---

[54] At the upcoming case management conference, the Court will set a schedule for resolving any claims to the interpled funds so that the funds due to Alvarado and Boswell can be released as soon as possible.

56

United States District Court
For the Northern District of California

1    <u>McCoy</u>

2        •        $997,670 in merits fees;

3        •        $100,013.51 in merits expenses;

4        •        $224,645 in fees-on-fees;

5        •        $6,647.75 in fees-on-fees expenses; and

6        •        Post-judgment interest at the applicable rate of interest on March 18, 2008

7    This order resolves Docket Nos. 1636, 1697, and 1701.

8

9        **IT IS SO ORDERED.**

10

11   Dated: September 30, 2011

12                                                SUSAN ILLSTON
                                                  United States District Judge

13